B. Lance Entrekin, Esq. (#016172)
**THE ENTREKIN LAW FIRM**
3101 North Central Avenue, #740
Phoenix, Arizona 85012
Telephone: 602.954.1123
Email: lance@entrekinlaw.com

Bradley J. Bondi (*Pro Hac Forthcoming*)
Traci Zeller (*Pro Hac Forthcoming*)
Michael D. Wheatley (*Pro Hac Forthcoming*)
Sara Ortiz (*Pro Hac Forthcoming*)
**PAUL HASTINGS LLP**
2050 M Street NW
Washington, DC 20036
Telephone:  202.551.1700
Email: bradbondi@paulhastings.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Trevor Milton, | |
| Plaintiff, | Case No: |
| v. | |
| Nikola Corporation; Britton Worthen; Dewitt Thompson V; Kim J. Brady; Mark A. Russell; Sooyean (Sophia) Jin; Mike Mansuetti; Gerrit A. Marx; Jeffrey W. Ubben; Stephen J. Girsky; Steven M. Shindler, | **COMPLAINT** |
| Defendants. | **JURY TRIAL DEMANDED** |

# <u>TABLE OF CONTENTS</u>

**Page**

COMPLAINT .................................................................................................................. 1

NATURE OF THE ACTION ........................................................................................... 1

PARTIES .......................................................................................................................... 9

       A.     Plaintiff ................................................................................................... 9
       B.     Defendants ............................................................................................. 9

JURISDICTION AND VENUE ..................................................................................... 15

FACTUAL ALLEGATIONS ......................................................................................... 16

I.      2015–MARCH 2020: MR. MILTON FOUNDS AND NURTURES NIKOLA AS A PRIVATE COMPANY ............................................................................. 16

       A.     Mr. Milton Founds Nikola .................................................................. 16
       B.     Nikola Hires Experienced and Knowledgeable Professionals To Run and Advise the Company .................................................................... 17
       C.     Nikola Grows Exponentially as a Private Company Under Mr. Milton's Leadership ............................................................................ 21

II.     MARCH 2020 – SEPTEMBER 2020: NIKOLA GOES PUBLIC ................... 21

       A.     The SPAC Transaction ........................................................................ 21
       B.     The Post-Merger Board ....................................................................... 22
       C.     "We Should Aspire for Trevor To Do the Same" as Virgin's Richard Branson: Nikola Purposefully Enlists Mr. Milton as the Company's Spokesman To Gain a Retail Following .................................................. 22
       D.     Nikola's Internal and External Public Relations and Marketing Teams Schedule Mr. Milton for Interviews ........................................... 24
       E.     Mr. Milton Asks Chief Legal Officer Worthen and Others To Review and Approve His and the Company's Public Statements ......................... 25
       F.     The Individual Defendants and Others at Nikola Tell Mr. Milton He Is Doing a Great Job ............................................................................. 29
       G.     Chief Legal Officer Worthen Tells Bloomberg News That Mr. Milton "Never Deceived Anyone." ...................................................................... 31
       H.     "Silent Disagreement is Unproductive": The Defendants Fail To Take Action When Confronted With Potential Ambiguities in Mr. Milton's Public Statements ................................................................................. 31
       I.     Nikola Does Not Issue Any Corrective Disclosures Related to Any Potential Ambiguities in Mr. Milton's Public Statements, But Instead Continues To Promote Mr. Milton's Statements on the Company's Social Media Platforms .... 40

III.    SEPTEMBER 10–20, 2020: THE HINDENBURG REPORT ......................... 40

       A.     The Company Defends Itself and Mr. Milton Following the Release of the Hindenburg Report ........................................................................ 40
       B.     The Officers and Directors Defend Mr. Milton and Nikola in the Immediate Aftermath of the Hindenburg Report ................................... 42

C.   Mr. Milton Voluntarily Resigns ................................................. 46

IV.   NIKOLA FEEDS THE GOVERNMENT A FALSE NARRATIVE, AND MR. MILTON IS CHARGED BASED ON THAT NARRATIVE ......................................... 46

A.   The Government Charges Trevor ............................................. 46

B.   The Individual Defendants and the Company Knowingly Provided the Government With False and Misleading Information ........................................... 50

C.   Nikola Intended for the Government To Use the Information Publicly To Charge Mr. Milton ...................................................... 64

D.   Nikola Failed To Correct the False and Misleading Information ...................... 65

V.   NIKOLA SETTLES WITH THE SEC FOR $125 MILLION ........................... 65

VI.   MR. MILTON IS CRIMINALLY TRIED BASED ON THE DEFENDANTS' MISREPRESENTATIONS TO THE GOVERNMENT ................................ 66

COUNT I Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder (Against All Defendants) ............................................. 70

COUNT II Control Person Liability Under Section 20(a) of the Exchange Act (Individual Defendants) ...................................................... 75

COUNT III Direct Action for Breach of Fiduciary Duties of Care, Loyalty, and Good Faith ..................................................... 76

COUNT IV Direct Action for Breach of Fiduciary Duty  (Against Individual Defendants) ..................................................... 76

PRAYER FOR RELIEF ....................................................... 80

JURY DEMAND ........................................................... 81

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**COMPLAINT**

2      1.      Plaintiff Trevor Milton ("Mr. Milton" or "Plaintiff"), by his undersigned

3   attorneys, files this action against Nikola Corporation ("Nikola" or the "Company") and

4   Britton Worthen, Dewitt Thompson V, Kim J. Brady, Mark A. Russell, Sooyean (Sophia)

5   Jin, Mike Mansuetti, Gerrit A. Marx, Jeffrey W. Ubben; Stephen J. Girsky, and Steven M.

6   Shindler, as officers and/or directors, or former officers and/or directors, of Nikola (the

7   "Individual Defendants") (together with Nikola, the "Defendants") for violations of Section

8   10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5

9   thereunder, Section 20(a) of the Exchange Act, and breaches of fiduciary duties of care,

10  loyalty, good faith, candor, and truthful disclosure and alleges the following:

11

**NATURE OF THE ACTION**

12      2.      Never has there been such an egregious case of corporate scapegoating at the

13  expense of shareholders, including Mr. Milton.  On or about July 29, 2021, the United States

14  Department   of   Justice   ("DOJ")   and   the   Securities   and   Exchange   Commission

15  ("SEC")(together with the DOJ, the "Government") charged Mr. Milton with securities

16  fraud and wire fraud for allegedly defrauding investors for personal gain by intentionally

17  making  material  misrepresentations  in  interviews  and  on  social  media  about  Nikola's

18  products and technology beginning in November 2019 and ending on or about September

19  10, 2020.

20      3.      But these charges are a case of garbage in, garbage out.  Beginning on or

21  about June 6, 2022, Mr. Milton learned over time that the Individual Defendants and the

22  Company—directly   or   through   the   Company's   outside   counsel—knowingly   and

23  intentionally provided the Government with materially false and misleading information,

24  and failed to provide material information that would have made the Individual Defendants'

25  and  the  Company's  statements  not  misleading.   This  materially  false  and  misleading

26  information  that  the  Individual  Defendants  and  the  Company  disseminated  to  the

27  Government included information relating to the Company's trucks, the components within

28  those trucks, the Company's technology, the Company's media strategy that included an

1

effort to use Mr. Milton to promote the Company's products, and Mr. Milton himself.

4.      The Individual Defendants and the Company knew and intended that the Government would, in turn, disseminate the materially false and misleading information to the public and that the Government would use the information to charge Mr. Milton and thereby spare the Individual Defendants of any liability.

5.      On or about July 29, 2021 and thereafter, when the Government publicized the materially false and misleading information provided by the Individual Defendants and the Company in the charges the Government filed against Mr. Milton, the Individual Defendants and the Company took no steps to correct the materially false and misleading information that came from the Defendants, despite a legal obligation to do so. As a direct result, the Company's stock price decreased, and it has continued to decrease ever since, and the Company and its shareholders have been harmed.

6.      Based on the materially false and misleading information, on or about December 21, 2021, the SEC entered into a settlement agreement with the Company that included an egregiously large penalty amount and that primarily pinned the wrongdoing on Mr. Milton to further ensure the Individual Defendants' and the Company's continued cooperation with the Government, and to spare the Individual Defendants from any liability.

7.      In short, the Individual Defendants and the Company fed materially false and misleading information to the Government, and based on that materially false and misleading information, the Government made incorrect public statements and improperly charged Mr. Milton and the Company with violating the securities laws. The Individual Defendants, to avoid personal civil and criminal liability, stood idly by and did nothing while the Government pursued these charges. The Individual Defendants' and the Company's materially false and misleading disclosures disseminated to the Government, the Government's resulting incorrect statements and charging decisions, and the Defendants' utter failure to correct the public statements that originated with them, have caused substantial harm and damages to the Plaintiff, Mr. Milton.

8.      The Individual Defendants scapegoated Mr. Milton to save themselves from

personal liability.  As Mr. Milton first learned beginning on June 6, 2022 and thereafter, the Individual Defendants' and the Company's wrongdoing began long before the Individual Defendants and the Company provided false and misleading information to the Government.  Mr. Milton later learned that the Individual Defendants privately had concerns among themselves about Mr. Milton being the public face of a public company. Nevertheless, beginning in early 2020, just before the Company announced that it planned to go public, the Individual Defendants and the Company encouraged Mr. Milton to publicly promote Nikola's products, achievements, and business plan so that Mr. Milton could gain a retail investor following.  The Individual Defendants and the Company went so far as to devise and launch a media strategy that put Mr. Milton in a national and public-facing role. The Individual Defendants and the Company told Mr. Milton that they aspired for Mr. Milton to be like Virgin Group's Richard Branson, who "got a retail following," and "aspire[d] for [Mr. Milton] to do the same" with a "[b]ig launch on TV" because "[Mr. Milton's] personality comes through."

9.    To Mr. Milton's face, the Individual Defendants and the Company  endorsed and encouraged his public statements about Nikola, which were made openly and in full view of the Individual Defendants and the Company.  Between early 2020 and September 2020, Company representatives—with the full knowledge and support of the Individual Defendants—scheduled Mr. Milton for nationally televised interviews and podcasts, in which the Government later would allege that Mr. Milton made material misstatements. The Company, at the direction of certain of the Individual Defendants, promoted the same interviews and podcasts on the Company's social media platforms, ensuring that the interviews and podcasts were disseminated widely.

10.    Mr. Milton trusted that the Individual Defendants, or individuals at the Individual Defendants' direction, and the Company were reviewing what he was saying about Nikola, both before and after his interviews and social media posts, and would correct or clarify his statements if needed.  In several instances, certain of the Individual Defendants even had an opportunity to review and edit Mr. Milton's statements before their public

release.  Mr. Milton believed that the Individual Defendants, or individuals at the Individual Defendants' direction, and the Company were reviewing his public statements because they provided him with feedback about specific interviews that they had watched Mr. Milton give, telling Mr. Milton on many separate occasions, for example, "great job!!", "well done," "very well handled," "excellent job," "FANTASTIC," and "great interview!!"  Mr. Milton also regularly sought advice, specifically from Chief Legal Officer Britton Worthen ("Worthen"), regarding whether legally Mr. Milton could or should make certain public statements.  From Mr. Milton's perspective, as reflected in the statements to him by the Individual Defendants, or individuals at the Individual Defendants' direction, and the Company, Mr. Milton was communicating well and accurately to the public about the Company's business model.  Mr. Milton did not believe at the time (and does not believe today) that he had made any misstatements, and neither the Individual Defendants nor the Company gave Mr. Milton any reason to believe that he had made inaccurate statements, let alone purported misstatements that could form the basis for any criminal charges. Instead, the Individual Defendants and the Company encouraged and applauded Mr. Milton's media appearances.

11. Behind Mr. Milton's back, however, Mr. Milton later learned that unbeknownst to Mr. Milton, and in contrast to the positive feedback the Company, the Individual Defendants, and others at the Company (who worked at the direction of the Individual Defendants) provided to him, the Individual Defendants, including Chief Executive Officer Mark Russell ("Russell"), Chief Financial Officer Kim Brady ("Brady"), allegedly were becoming increasingly concerned about the accuracy of Mr. Milton's statements.  On several occasions after the Company went public in June 2020, Nikola's employees raised concerns to Russell, Brady, and Worthen about specific statements Mr. Milton made in interviews and on social media.  Mr. Milton later learned, beginning on June 6, 2022 and thereafter, that when presented with these potential ambiguities in what Mr. Milton was saying, the Individual Defendants, including Russell, Brady, and Worthen, did nothing and said nothing to either Mr. Milton or Nikola's Board of Directors.  Indeed,

Mr. Milton later learned, beginning on June 6, 2022 and thereafter, that Russell, Brady, and, Worthen failed even minimally to investigate adequately these reports of potential ambiguities in Mr. Milton's public statements. They did not raise the concerns to Mr. Milton or to Nikola's Board of Directors. The Individual Defendants and the Company made no attempts to correct, clarify, or contextualize any of Mr. Milton's statements that may have been ambiguous.

12. On September 10, 2020, the short seller Hindenburg Research, LLC ("Hindenburg") published a report falsely claiming that Mr. Milton was a fraud and that Nikola was built on an "ocean of lies" (the "Hindenburg Report"). The Hindenburg Report falsely claimed that Mr. Milton lied in interviews and on social media during the time period from the Company's founding in 2016 through September 2020 about various aspects of Nikola's technology, products, and progress.

13. Initially, the Company and Individual Defendants, including Russell, Brady, and Jeff Ubben ("Ubben") vigorously defended Mr. Milton and the Company, publicly stating that the Hindenburg Report was "false and defamatory" and that it included many "false and misleading statements regarding the Company's operations and multi-year, groundbreaking R&D efforts."

14. The Company's and the Individual Defendants' defense of Mr. Milton and the Company withered after the Government issued subpoenas to the Company related to the allegations in the Hindenburg Report. Shortly after the Hindenburg Report was published, the Government issued subpoenas to Mr. Milton and the Company seeking documents and information related to the claims in the Hindenburg Report. After recognizing, and being advised regarding, their own criminal and civil liability related to the claims in the Hindenburg Report, the Individual Defendants and the Company turned on Mr. Milton, who had resigned voluntarily on September 20, 2020.

15. Beginning on June 6, 2022 and thereafter, Mr. Milton learned that the Individual Defendants and the Company completely capitulated to the Government between September 2020 and September 2022 to avoid criminal and civil liability, and that they

knowingly provided materially false and misleading information and omitted material information to the Government, including but not limited to:

      a.  **That Mr. Milton intended to mislead investors about the current status of Nikola's productions and technology**, when the Individual Defendants and numerous other Nikola employees, expressly did not believe, and told the Company that they did not believe, that Mr. Milton committed fraud or intended to mislead, but instead they understood Mr. Milton to be talking about Nikola's business plan and what Nikola intended to achieve in the future.

      b.  **Providing the Government with a fictitious scheme**, namely, that Mr. Milton, covertly and without the Company's knowledge or authorization, engaged in an intentional social media campaign to target retail investors and induce them to purchase Nikola's stock, when the Company and the Individual Defendants, including Russell, Brady, Worthen, Ubben, and Stephen Girsky ("Girksy") knew that they devised and launched a media strategy that put Mr. Milton in a national, public-facing role.  The Company also omitted material information regarding the Company's and the Individual Defendants' review and approval of certain of Mr. Milton's statements that the Government later alleged to be materially misleading.  The Company and the Individual Defendants also provided the Government with the false narrative that they did everything they could to stop Mr. Milton from misspeaking when, in reality, as Mr. Milton later learned, they failed even to investigate the specific reports of ambiguities in his statements, which easily could have been contextualized, clarified, or corrected at the time.

      c.  **Providing the Government with a fictitious motive for Mr. Milton's alleged scheme to defraud**, namely, that Mr. Milton was motivated to engage in the allegedly fraudulent scheme in order to enrich himself and elevate his stature as an entrepreneur, when this theory was concocted by the Company's legal counsel and adopted by the Company and the Individual Defendants.

d. **Representing to the Government that, in January 2018, it was Mr. Milton alone who tweeted a video where an early semi-truck prototype, the "Nikola One," appeared to be driving and represented that the truck was "in motion" when the truck was not being driven under its own power**. In reality, the Company and the Individual Defendants knew that Worthen approved posting the video, drafted the language that the truck was "in motion" in the video, and counseled Mr. Milton and the Company that both posting the video and the "in motion" language was legally permissible.

e. **Representing to the Government that, between November 2019 and September 2020, Nikola had not successfully developed internally a number of semi-truck component parts, including Nikola's batteries**. In reality, the Company and the Individual Defendants knew that a number of Nikola's critical component parts were designed by Nikola and manufactured by third parties to Nikola's specifications, with Nikola owning the intellectual property to these components, contextualizing Mr. Milton's allegedly misleading statements. The Company and the Individual Defendants also knew that numerous Nikola employees believed that Mr. Milton correctly described certain component parts as being developed "in house" by Nikola.

f. **Giving the Government the misimpression that Nikola's two pickup truck prototypes, named the "Badger," were nothing more than another company's truck that was dressed up with Nikola branding**, when the Company and the Individual Defendants knew this to be false.

16. These false and misleading statements and omissions, which the Company and the Individual Defendants, not only disseminated to the Government but then failed to correct, led to Mr. Milton's indictment and conviction for securities fraud, causing significant damage to Mr. Milton, individually and as a shareholder of Nikola. These lies have created a general misperception in the marketplace that Nikola was, and may still be, a fraud; that its founder, Mr. Milton, built the Company on an "ocean of lies;" and that Mr.

Milton and Nikola are similar to Elizabeth Holmes and Theranos, the failed blood-testing company.[1]  This narrative is a clear falsehood and one that the Company and the Individual

---

[1] *See, e.g.*, Steve Tengler, *The Same Lesson From Both Nikola Motors And Theranos: Pop the Hood*, FORBES (Sept. 1, 2021), https://www.forbes.com/sites/stevetengler/2021/09/01/the-same-lesson-from-both-nikola-motors-and-theranos-pop-the-hood/?sh=2e398a00368a ("The criminal trial of Elizabeth Holmes, the former founder and CEO of Theranos, started yesterday in San Jose, California. The trial of Trevor Milton, the former founder and CEO of Nikola Motors, awaits its time in court, likely in the coming weeks or months.  The two stories have eerily similar crescendos that are culminating in court proceedings at nearly identical times . . . . Holmes like Milton supposedly perfected the art of "fake it until you make it" and, in both cases, the dishonesty centered around inoperative technology named after a famous scientist."); Erin Griffith, *Lifestyles of the Rich and Gullible: Theranos and Ozy Edition*, THE NEW YORK TIMES (Oct. 9, 2021), https://www.nytimes.com/2021/10/09/business/ozy-theranos-startup-lawsuits.html ("In the three years since Ms. Holmes was charged with defrauding investors about Theranos, other prominent investors have revealed how they were convinced to give significant backing to start-ups that defied logic.  WeWork claimed it had a healthy, profitable business when it was setting cash on fire.  Nikola, an autonomous trucking company, rolled a truck down a hill to show its vehicles could drive itself."); Abigail Rubenstein, *What happens when you fake it and don't make it?  Elizabeth Holmes' fraud verdict offers a warning*, THE BUSINESS OF BUSINESS (Jan. 4, 2022), https://www.businessofbusiness.com/articles/what-happens-when-you-fake-it-and-dont-make-it-elizabeth-holmes-fraud-verdict-offers-a-warning/ ("Though Holmes may be the biggest fraud story in tech at the moment, she's hardly likely to be the last.  Jessica Richman and Zachary Apte, the founders of poop-testing startup uBiome, are now on the run from the Feds in Germany after being accused of lying to investors about whether their testing products were covered by insurance.  Another is Trevor Milton[.]"); Allie Conti, *Nikola Truck Scandal Has Trevor Milton Facing Whistleblowers*, BLOOMBERG (Sept. 13, 2022), https://www.bloomberg.com/news/features/2022-09-13/nikola-truck-scandal-has-trevor-milton-facing-whistleblowers ("A few months later, a short seller named Nate Anderson of Hindenburg Research produced a devastating report on Milton and Nikola, describing entrepreneurial hubris, investor exuberance, and echoes of Elizabeth Holmes and Theranos."); Bushey and Joe Miller, *Nikola founder Trevor Milton convicted of fraud*, FINANCIAL TIMES (Oct. 14, 2022), https://www.ft.com/content/55236b13-548a-4fc2-bb21-a16834cb94b5 ("In closing arguments, prosecutors referred to a 2018 email from Brady citing Theranos — the blood-testing start-up led by Elizabeth Holmes, who was convicted of fraud earlier this year — as a warning of what could happen if an executive misrepresented a product."); Ephrat Livni, *Just How Common Is Corporate Fraud?*, THE NEW YORK TIMES (Jan. 14, 2023), https://www.nytimes.com/2023/01/14/business/dealbook/how-common-is-corporate-fraud.html ("Last year, Trevor Milton, the founder of Nikola, the electric vehicle maker, and Elizabeth Holmes, founder of the blood testing company Theranos, were both found guilty of fraud in high profile trials.").

Defendants had an affirmative obligation to correct but failed to do so.  As a result, Nikola's stock price has remained depressed and Nikola's stock faces being delisted by the Nasdaq stock exchange.  As a result of the Company's and the Individual Defendants' actions and omissions described above, the Defendants committed securities fraud, and the Individual Defendants breached their fiduciary duties.

17.     The Defendants' misconduct caused Mr. Milton over $1 billion in damages.

**PARTIES**

**A.     Plaintiff**

18.     Plaintiff Trevor Milton is the founder, former Chief Executive Officer, and former Executive Chairman of Nikola.  Mr. Milton continuously has held Nikola's stock at least since 2015, when he founded the Company.  Mr. Milton is a resident of Wyoming.  Previously, Mr. Milton was a resident of Arizona.  The allegations contained herein caused Mr. Milton harm in Arizona.

**B.     Defendants**

19.     Defendant Nikola f/k/a VectoIQ Acquisition Corp. ("VectoIQ") is a Delaware corporation headquartered at 4141 E Broadway Road, Phoenix, Arizona 85040.  Nikola stock trades on the Nasdaq stock exchange under the ticker symbol "NKLA."  Prior to June 4, 2020, the Company's stock traded on the Nasdaq stock exchange under the ticker symbol "VTIQ."  The allegations contained herein caused harm to Nikola in Arizona.

20.     Defendant Worthen has been the Executive Vice President, Chief Legal Officer, and corporate secretary of the Company since June 2020.  Previously, from 2016 to June 2020, Worthen served as Chief Legal Officer of Nikola Motor.  Worthen is an Arizona resident and is licensed to practice law in Arizona.  At all times relevant to this Complaint, Worthen lived in Arizona, worked in Arizona, or otherwise purposefully directed his activities to Arizona or purposefully availed himself of the privilege of conducting activities in Arizona by serving as the General Counsel of Nikola, including

1   with respect to the allegations, including fraud, contained herein.  In Nikola's public filings,

2   Worthen's address was listed as c/o Nikola Corporation, 4141 E Broadway Road, Phoenix,

3   Arizona 85040.  As alleged herein, Worthen committed intentional acts that were aimed

4   expressly at Arizona and that foreseeably caused Mr. Milton and Nikola harm in Arizona.

5   But for Worthen's acts directed at Arizona, Mr. Milton and Nikola would not have been

6   harmed.

7        21.     Defendant DeWitt Thompson, V ("Thompson") was a Director of the

8   Company from June 2020 until October 2022.  Previously, from July 2017 to June 2020,

9   Thompson served as a Director of Nikola Motor.  He was a member of the Compensation

10  Committee.   Thompson was the Chairman and Chief Executive Officer of Thompson

11  Machinery Commerce Corporation, a dealer for Caterpillar Inc. construction, mining and

12  other engineering equipment.   At all times relevant to this Complaint, Thompson

13  purposefully directed his activities to Arizona or purposefully availed himself of the

14  privilege of conducting activities in Arizona by serving as a Director of Nikola and

15  frequently visiting Arizona, including with respect to the allegations, including fraud,

16  contained herein.  As alleged herein, Thompson committed intentional acts that were aimed

17  expressly at Arizona and that foreseeably caused Mr. Milton and Nikola harm in Arizona.

18  But for Thompson's acts directed at Arizona, Mr. Milton and Nikola would not have been

19  harmed.

20        22.     Defendant Brady served as the Chief Financial Officer of the Company from

21  June 2020 until April 2023.  Previously, from November 2017 to June 2020, Brady served

22  as Chief Financial Officer and Treasurer of Nikola Motor.  Brady is a resident of Arizona.

23  In 2020, the Company provided Mr. Brady with a stipend to relocate to Arizona.  At all

24  times relevant to this Complaint, Brady lived in Arizona, worked in Arizona, or otherwise

25  purposefully directed his activities to Arizona or purposefully availed himself of the

26  privilege of conducting activities in Arizona by serving as the Chief Financial Officer of

27  Nikola, including with respect to the allegations, including fraud, contained herein.  In

28  Nikola's public filings, Brady's address was listed as c/o Nikola Corporation, 4141 E

Broadway Road, Phoenix, Arizona 85040.  As alleged herein, Brady committed intentional acts that were aimed expressly at Arizona and that foreseeably caused Mr. Milton and Nikola harm in Arizona.  But for Brady's acts directed at Arizona, Mr. Milton and Nikola would not have been harmed.

23.     Defendant Russell served as the Chief Executive Officer and a Director of the Company from June 2020 until June 2023.  Previously, from February 2019 to June 2020, Russell was the President of Nikola's predecessor company, Nikola Motor Company ("Nikola Motor").  Russell also served as a Director of Nikola Motor from July 2019 to June 2020.  At all times relevant to this Complaint, Russell lived in Arizona, worked in Arizona, or otherwise purposefully directed his activities to Arizona or purposefully availed himself of the privilege of conducting activities in Arizona by serving as the Chief Executive Officer and a Director of Nikola, including with respect to the allegations, including fraud, contained herein.  In Nikola's public filings, Russell's address was listed as c/o Nikola Corporation, 4141 E Broadway Road, Phoenix, Arizona 85040.  As alleged herein, Russell committed intentional acts that were aimed expressly at Arizona and that foreseeably caused Mr. Milton and Nikola harm in Arizona.  But for Russell's acts directed at Arizona, Mr. Milton and Nikola would not have been harmed.

24.     Defendant Sophia Jin ("Jin") served as a Director of the Company from June 2020 until April 2022.  Previously, from May 2019 to June 2020, Jin served as a Director of Nikola Motor.  She was a member of the Nikola Motor Board's Audit Committee.  Jin was Senior Director of Venture Investments of Hanwha Holdings, the world's leading supplier of solar cell production capacity.  She holds a master of business administration degree from Stanford University.  At all times relevant to this Complaint, Jin purposefully directed her activities to Arizona or purposefully availed herself of the privilege of conducting activities in Arizona by serving as a director of Nikola and frequently visiting Arizona, including with respect to the allegations, including fraud, contained herein.  In Nikola's public filings, Jin's address was listed as c/o Nikola Corporation, 4141 E Broadway Road, Phoenix, Arizona 85040.  As alleged herein, Jin committed intentional

1   acts that were aimed expressly at Arizona and that foreseeably caused Mr. Milton and

2   Nikola harm in Arizona.  But for Jin's acts directed at Arizona, Mr. Milton and Nikola

3   would not have been harmed.

4       25.    Defendant Mike Mansuetti ("Mansuetti") has served as a director of the

5   Company since June 2020.  He is a member of the Board's Audit Committee.  Previously,

6   from September 2019 to June 2020, Mansuetti served as a Director of Nikola Motor.

7   Mansuetti was the President and a director of Robert Bosch LLC, a multinational

8   engineering and technology company.  At all times relevant to this Complaint, Mansuetti

9   purposefully directed his activities to Arizona or purposefully availed himself of the

10  privilege of conducting activities in Arizona by serving as a director of Nikola and

11  frequently visiting Arizona, including with respect to the allegations, including fraud,

12  contained herein.  In Nikola's public filings, Mansuetti's address was listed as c/o Nikola

13  Corporation, 4141 E Broadway Road, Phoenix, Arizona 85040.  As alleged herein,

14  Mansuetti committed intentional acts that were aimed expressly at Arizona and that

15  foreseeably caused Mr. Milton and Nikola harm in Arizona.  But for Mansuetti's acts

16  directed at Arizona, Mr. Milton and Nikola would not have been harmed.

17      26.    Defendant Gerrit Marx ("Marx") was a Director of the Company from June

18  2020 until June 2023.  Previously, from September 2019 to June 2020, Marx served as a

19  Director of Nikola Motor.  He served as the Chair of the Company's Compensation

20  Committee and was a member of the Company's Nominating and Corporate Governance

21  Committee.  Marx is the Chief Executive Officer of Iveco Group NV, a global automotive

22  leader active in the Commercial & Specialty Vehicles, Powertrain, and related Financial

23  Services arenas; and previously was the President of Commercial and Specialty Vehicles of

24  CNH Industrial N.V.  At all times relevant to this Complaint, Marx purposefully directed

25  his activities to Arizona or purposefully availed himself of the privilege of conducting

26  activities in Arizona by serving as a director of Nikola and frequently visiting Arizona,

27  including with respect to the allegations, including fraud, contained herein.  In Nikola's

28  public filings, Marx's address was listed as c/o Nikola Corporation, 4141 E Broadway

Road, Phoenix, Arizona 85040.  As alleged herein, Marx committed intentional acts that were aimed expressly at Arizona and that foreseeably caused Mr. Milton and Nikola harm in Arizona.  But for Marx's acts directed at Arizona, Mr. Milton and Nikola would not have been harmed.

27.    Defendant Jeffrey Ubben ("Ubben") was a Director of the Company from June 2020 until February 2022.  Previously, from September 2019 to June 2020, Ubben served as a director of Nikola Motor.  He was the Chair of the Nominating and Corporate Governance Committee.  Ubben is the founder of ValueAct Capital Management, L.P., a financial services company, and served as a Director of numerous public companies, including Walt Disney Co. and Twenty-First Century Fox, Inc.  At all times relevant to this Complaint, Ubben purposefully directed his activities to Arizona or purposefully availed himself of the privilege of conducting activities in Arizona by serving as a director of Nikola and frequently visiting Nikola's headquarters in Arizona, including with respect to the allegations, including fraud, contained herein.  As alleged herein, Ubben committed intentional acts that were aimed expressly at Arizona and that foreseeably caused Mr. Milton and Nikola harm in Arizona.  But for Ubben's acts directed at Arizona, Mr. Milton and Nikola would not have been harmed.

28.    Defendant Stephen Girsky ("Girsky") has been the President and Chief Executive Officer of Nikola since August 2023.  Previously, from September 20, 2020 to August 2023, Girsky was the Executive Chairman of the Board of Directors.  Girsky was a member of Nikola's Board of Directors from June 3, 2020 to September 20, 2020.  Girsky, who, prior to the completion of the business combination with VectoIQ Acquisition Corp. ("VectoIQ") on June 3, 2020 (the "Reverse Merger') was VectoIQ's Chief Executive Officer, has degrees in mathematics and systems science from the University of California at Los Angeles and a Master of Business Administration degree from the Harvard Business School and more than 30 years of experience working with corporate board executives, labor leaders, Original Equipment Manufacturer ("OEM") leaders, suppliers, dealers, and national policymakers.  From 2009 to 2014, Girsky served in numerous capacities at

General Motors, including as Vice Chairman, with responsibility for global corporate strategy, new business development, global product planning and program management, global connected consumer/OnStar, GM Ventures LLC, Global Research & Development, and Global Purchasing and Supply Chain. Girsky previously was Chairman of the Adam Opel AG Supervisory Board and served as President of General Motors Europe. From 2005 to 2006, he was a special advisor to the Chief Executive Officer and Chief Financial Officer of General Motors. In addition to serving as a Director (and previously Chairman) of Nikola, Girsky has served on the boards of numerous other public and private companies, including VectoIQ; Brookfield Business Partners Limited, the general partner of Brookfield Business Partners, L.P., a publicly traded company; The Valens Company, Inc., a manufacturer of semiconductors, infotainment systems and other technology for the automotive industry; and as lead director of Dana Corporation, a supplier of axles, driveshafts, transmissions, and electrodynamic, thermal, sealing, and digital equipment for conventional, hybrid, and electric-powered vehicles. Girsky is a resident of Arizona. In 2023, the Company provided Mr. Girsky with a stipend to relocate to Arizona. At all times relevant to this Complaint, Girsky lived in Arizona, worked in Arizona, or otherwise purposefully directed his activities to Arizona or purposefully availed himself of the privilege of conducting activities in Arizona by serving as a director of Nikola, including with respect to the allegations, including fraud, contained herein. In Nikola's public filings, Girksy's address was listed as c/o Nikola Corporation, 4141 E Broadway Road, Phoenix, Arizona 85040. As alleged herein, Girsky committed intentional acts that were aimed expressly at Arizona and that foreseeably caused Mr. Milton and Nikola harm in Arizona. But for Girsky's acts directed at Arizona, Mr. Milton and Nikola would not have been harmed.

29.     Defendant Steve Shindler ("Shindler") has been the Executive Chairman of the Board of Directors of Nikola since August 2023. Previously, from October 2020 to August 2023, Shindler was a member of Nikola's Board of Directors and Chair of Nikola's Audit Committee. At all times relevant to this Complaint, Shindler purposefully directed

his activities to Arizona or purposefully availed himself of the privilege of conducting activities in Arizona by serving as a Director of Nikola and frequently visiting Arizona, including with respect to the allegations, including fraud, contained herein.  In Nikola's public filings, Shindler's address was listed as c/o Nikola Corporation, 4141 E Broadway Road, Phoenix, Arizona 85040.  As alleged herein, Shindler committed intentional acts that were aimed expressly at Arizona and that foreseeably caused Mr. Milton and Nikola harm in Arizona.  But for Shindler's acts directed at Arizona, Mr. Milton and Nikola would not have been harmed.

## JURISDICTION AND VENUE

30.     Pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and Section 20(a) of the Exchange Act.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

31.     This Court has jurisdiction over each of the Defendants named herein because each of the Defendants is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District, as alleged in paragraphs 19 to 28, above, so as to render the exercise of jurisdiction by the District court permissible under traditional notions of fair play and substantial justice. Nikola's corporate headquarters, out of which the Individual Defendants worked, are located in Phoenix, Arizona.

32.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) Nikola maintains its principal place of business in this District; (ii) one or more of the Individual Defendants, specifically Worthen and Brady, reside in or maintain executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein occurred in this District; and (iv) the Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities

1    that had an effect in this District.

2        33.    In connection with the acts alleged in this Complaint, Defendants, directly or

3    indirectly, used the means and instrumentalities of interstate commerce, including, but not

4    limited to, the mails, interstate telephone communications, and the facilities of the national

5    securities markets.

6                              **FACTUAL ALLEGATIONS**

7    **I.    2015–MARCH 2020: MR. MILTON FOUNDS AND NURTURES NIKOLA AS A PRIVATE COMPANY.**

8        **A.    Mr. Milton Founds Nikola**.

9        34.    Mr. Milton founded Nikola in 2015 as a privately held company that sought

10   to revolutionize the trucking industry by doing something that had never been done

11   before—to transform the global trucking industry by developing low- or zero-emission

12   Class 8 heavy trucks.  This mission was no simple task.  When Mr. Milton and his co-

13   founders first conceived of the idea for Nikola in or about 2015, the concept of a zero-

14   emissions tractor-trailer semi-truck was a vague notion that only a handful of industry

15   participants were even willing to consider.  And the concept of a semi-truck that could be

16   powered by hydrogen fuel—and thus achieve a longer range than a purely electric truck—

17   was even more remote and posed an even more daunting challenge.  Mr. Milton was the

18   only one willing to take that challenge on.  There was no blueprint on which Nikola could

19   rely.  The long-term vision for these trucks needed to be designed and built entirely from

20   scratch from the ground up.   And because the concept was so novel, Nikola

21   contemporaneously would need to develop a network of hydrogen-fueling stations to

22   service its semi-trucks on their routes.  This business conundrum is widely known as "the

23   chicken and the egg" problem.

24       35.    The idea for a company like Nikola dated back to when Mr. Milton was a six

25   year-old boy, visiting his father, a manager for Union Pacific Railroad, at work.  Diesel

26   locomotives run on electricity.  There, a train engineer told Mr. Milton that one day

27   someone would be smart enough to build a locomotive semi-truck.  This idea planted a seed

28   in Mr. Milton's mind.  That seed was a desire to build and create something that could better

the world and change the efficiencies of powertrains.

36.     As with all visionary endeavors, Mr. Milton and Nikola encountered unforeseen technical problems that had to be overcome, and they grappled with how to build and implement previously undeveloped (and unproven) technologies, all while working tirelessly to transform this long-term and world-changing vision into a scalable reality.

37.     At the time Mr. Milton founded Nikola, he was only 29 years old.  Other than one semester of college, Mr. Milton had no formal education after high school.  Prior to Nikola going public in June 2020, Mr. Milton had never worked for, much less held a senior position at, a publicly traded company.  Before Nikola, Mr. Milton never had served as a director of a public company.

**B.     Nikola Hires Experienced and Knowledgeable Professionals To Run and Advise the Company**.

**i.     Chief Legal Officer Britton Worthen.**

38.     Worthen, a graduate of the University of Michigan Law School, joined Nikola in October 2015 and was one of Nikola's earliest employees.  He was the first lawyer at the Company and has served as its Chief Legal Officer since Nikola became publicly traded.  At all relevant times, Defendant Worthen, a lawyer, has been a member of the Arizona Bar and was ethically obligated to abide by the rules of the Arizona Bar.

39.     Prior to joining Nikola, Defendant Worthen practiced law for 15 years at the Phoenix area firm of Beus Gilbert PLLC, working on a "wide array of corporate legal work, such as intellectual property and ***securities matters.***"[2]  As Chief Legal Officer of Nikola, Worthen has responsibility for all legal matters at Nikola, including corporate and securities compliance.  Worthen's LinkedIn profile confirmed that he is "***responsible for all corporate legal matters***, including, but not limited to, ***corporate and securities compliance***, transaction negotiation and documentation, dispute management ***and intellectual property protection***."[3]

---

[2]     Britton Worthen, LINKEDIN, https://www.linkedin.com/in/britton-worthen-1535701 (last visited May 30, 2024) (emphasis added).

[3]     *Id.* (emphasis added).

40.     Worthen was not a mere figurehead.   Worthen oversaw the securities compliance of Nikola.  As one of Nikola's earliest employees, and Nikola's only lawyer for the first several years, Worthen was involved extensively in, and knowledgeable about, all aspects of Nikola's business, at least at a general level, including the current status of Nikola's semi-truck and pick-up truck prototypes, Nikola's hydrogen production and infrastructure plans, the terms of Nikola's reservations, and the intellectual property that Nikola owned with respect to its component parts.  Worthen was involved in negotiating and memorializing all corporate agreements and reviewing all Company press releases. Worthen also attended weekly leadership meetings and meetings of the Board of Directors, where a variety of topics were discussed, both before and after Nikola became a public Company.

41.     Mr. Milton relied heavily on Worthen's advice in connection with virtually every aspect of the business, including Mr. Milton's public statements and appearances. For example, during a June 2020 lunch with Nikola fans, at Nikola's headquarters, in a video that Mr. Milton posted to his Instagram account, Mr. Milton stated publicly that Worthen was going with him "to make sure that [they] don't get in trouble . . . that no questions [were] answered . . . that could put [them] in trouble."

42.     Mr. Milton conferred frequently with Worthen on numerous corporate and legal issues.  In the early days of Nikola, between 2017 and mid-2019, after the Company moved out of the basement of Mr. Milton's home and into an office space in Utah, Mr. Milton and Worthen sat immediately next to one another.  When the Company moved the base of its operations to Phoenix, Arizona in mid-2019, Mr. Milton's office was directly next to Worthen's.  Mr. Milton communicated in person with Worthen multiple times per day because of their close physical proximity in Nikola's offices.  They spoke by phone nearly daily regarding various issues.  By way of example, in merely the six weeks between July 31, 2020 through mid-September 2020, Mr. Milton and Worthen spoke directly on *at least 252 phone calls totaling at least 21 hours and 39 minutes*.

43.     Witnesses have said that Worthen provided Mr. Milton regular and frequent

advice regarding what could and should (and what could not and should not) be said publicly. As described *infra*, Worthen did not shy away from pushing back when Mr. Milton raised ideas that Worthen thought needed refining from a legal perspective. Mr. Milton fully expected Worthen to review everything he said and to provide immediate feedback if necessary. There were some instances where Worthen asked Mr. Milton either to take a tweet or video down or to clarify a tweet, and Mr. Milton did just that because Mr. Milton relied heavily on Worthen to correct Mr. Milton and advise him whenever needed. But Defendant Worthen, unbeknownst to Mr. Milton, failed to review regularly Mr. Milton's statements (despite indicating otherwise at the time).

44.     Worthen held a particularly important position of trust in Mr. Milton's life. Worthen also functioned as Mr. Milton's personal attorney and advised Mr. Milton on a broad range of matters. Outside of the legal context, Mr. Milton and Worthen attended the same Church, and Worthen was a bishop in that Church, with duties similar to those of a pastor, priest or rabbi. In short, Worthen was one of Mr. Milton's closest and most trusted advisors and friends up until Worthen betrayed his client, and friend to save himself from being targeted for his own misconduct.

### ii.     Chief Executive Officer Mark Russell.

45.     Russell, who joined Nikola in 2019 as its President and later became Chief Executive Officer, brought significant management experience and experience in heavy manufacturing to Nikola.

46.     Before joining Nikola, Russell served as President and Chief Operating Officer of Worthington Industries ("Worthington"), a publicly traded company, from 2012 to 2018. Worthington is a leading manufacturing company with significant automotive focus, supplying makers of more than 50 different components including frames, wheels, suspension systems, transmissions, and drivetrains. Russell was President of Worthington Steel from 2007 to 2012.

47.     Prior to Worthington, Russell was the Chief Executive Officer of Russell & Associates, a group formed to acquire aluminum products companies, from 2004 to 2007.

From 2002 to 2004, he served as Chief Executive Officer of Indalex Inc., which then was North America's largest independent aluminum extruder.  Earlier he had served as a corporate development manager and then as general manager of engineered aerospace products for Alcoa Corporation from 1999 to 2002.  Russell received a degree in integrated studies from Weber State University in 1987 and a juris doctorate degree from Brigham Young University Law School in 1990.  After graduating from law school, Russell practiced securities law at Kirkland & Ellis LLP.  Since 2009, Russell has served as a member of the National Advisory Council of Brigham Young University's Marriott School of Business.

48.     Russell is approximately 20 years older than Mr. Milton.  Russell believed Mr. Milton considered him a mentor, and Russell considered Mr. Milton to be a mentee. When the Company moved to its Phoenix, Arizona headquarters, Russell's office also was on the same floor as Mr. Milton's office.

### iii.     Chief Financial Officer Kim Brady.

49.     Brady joined Nikola in 2017 as its Chief Financial Officer.  Brady holds an undergraduate degree from Brigham Young University's Marriott School of Business and a master of business administration degree from the Kellogg Graduate School of Management at Northwestern University.  He also holds Series 7 and Series 63 licenses from the Financial Advisory Regulatory Authority.

50.     Prior to joining Nikola, Brady had 20 years of experience in investment banking, private equity, and corporate restructuring.  Immediately before joining Nikola, Brady served as a senior managing director of SOLIC Capital Advisors, LLC.  He has consummated over four billion dollars in transactions and recapitalizations and has overseen the successful performance improvements and reorganizations in over 100 businesses over the past decade.  He previously served as the chief financial officer, general manager, and financial advisor for various companies in manufacturing, business services, and healthcare services.  Before joining SOLIC Capital Advisors, LLC, Brady served as general manager and Chief Financial Officer for Doshi Diagnostic (a division of PrimeCare International); Vice President of Business Development for PrimeCare International; and manager of

strategy and planning, European Operations, with Baxter International, Inc.  He also has served on the board of directors of SurePeople, LLC and as executive chairman of Ascentec Engineering, LLC.

51.     When the Company moved to its Phoenix, Arizona headquarters, Brady's office also was on the same floor as Mr. Milton's office.

**C.     Nikola Grows Exponentially as a Private Company Under Mr. Milton's Leadership**.

52.     Under Mr. Milton's leadership from 2015 through March 2020, Nikola, while still a private company, grew from a basement startup with under a dozen employees to having raised over $300 million over four fundraising rounds; built a large headquarters in Phoenix, Arizona; hired over 250 employees; and began building a factory to produce its semi-trucks.  In less than five years, Nikola achieved remarkable accomplishments towards its goal of bringing to market hydrogen-electric semi-trucks and a network of hydrogen stations to fuel them.  Indeed, in 2019, Nikola had built and driven two hydrogen prototype semi-trucks under their own power and even delivered a semi-truck load of beer on public roads with a partner at the time.

**II.     MARCH 2020 – SEPTEMBER 2020: NIKOLA GOES PUBLIC.**

**A.     The SPAC Transaction.**

53.     Nikola's development of a scalable commercial hydrogen electric semi-truck continued in 2020.  On June 3, 2020, Nikola Motor became a publicly traded company through the Reverse Merger with VectoIQ.

54.     VectoIQ was a special purpose acquisition company, or SPAC, incorporated in Delaware in 2018 with the purpose of effecting a "reverse merger" with a target company. VectoIQ stock was publicly traded on the Nasdaq stock exchange.

55.     VectoIQ began conducting diligence on Nikola Motor as a potential merger target in late 2019.  VectoIQ conducted months of robust diligence into Nikola Motor, including by assembling a number of industry experts to advise VectoIQ with respect to vehicle development, electrification, fuel cells, software, connectivity and manufacturing.

56. On March 3, 2020, VectoIQ and Nikola Motor announced a proposed transaction to merge. As part of the Reverse Merger, VectoIQ changed its name to Nikola, making Nikola a publicly traded company.

57. Following the Reverse Merger, Nikola began trading on the Nasdaq stock exchange under the ticker symbol "NKLA".

**B.    The Post-Merger Board.**

58. When Nikola became a public company, its board of directors consisted of Mr. Milton, Girsky, Jin, Mansuetti, Marx, Russell, Lon Stalsberg, Thompson, and Ubben (collectively, the "Post-Merger Board"). Like Russell, Brady, and Worthen, as described above, the directors on the Post-Merger Board other than Mr. Milton were (and are) educated, accomplished professionals who brought significant public company experience and industry sector experience to their board service.

59. Other than Mr. Milton and Russell, all directors of Nikola were independent directors under SEC regulations and the listing standards of the Nasdaq stock exchange.

60. Mr. Milton never owned a controlling interest in Nikola while Nikola was publicly traded. As such, the Post-Merger Board at any time could have removed Mr. Milton from his position as Executive Chairman or otherwise prevented him or any other officer from taking any actions of which the Board did not approve.

**C.    "We Should Aspire for Trevor To Do the Same" as Virgin's Richard Branson: Nikola Purposefully Enlists Mr. Milton as the Company's Spokesman To Gain a Retail Following.**

61. The Company and the Individual Defendants agreed that Mr. Milton was good at communicating Nikola's vision. Ubben and Girsky in particular urged Mr. Milton to be the face of the Company and to market the Company actively, particularly on social media. For example, Ubben encouraged Mr. Milton to follow the aggressive media schedule of Richard Branson. In an email on or about February 29, 2020 with the subject line "Virgin Galactic–Media & SEC Filing Timeline," Ubben forwarded to Mr. Milton and Girsky a sample timeline of Richard Branson's media activities, stating, "Branson got a retail following. We should aspire for Trevor to do the same. I can propose a PR firm if

interested." Girsky agreed, suggesting that "Trevor [should do] TV solo." Ubben forwarded his email about Mr. Milton gaining a retail investor following to Brady and Russell, stating that Nikola should have a "[b]ig launch on TV" because "Trevor['s] personality comes through."

62.     Similarly, in a text message on or about February 26, 2020, Girsky encouraged Mr. Milton to appear on CNBC and promised, "I'll get it put together." Girsky continued to encourage Mr. Milton to pursue retail investors, texting him on or about June 8, 2020 a screenshot showing Nikola's popularity on the Robinhood online trading platform and telling Mr. Milton that the metric was "[r]eally impressive," then congratulating Mr. Milton on his "ability to connect with people that is very rare."

63.     The Company and the Individual Defendants made it clear to Mr. Milton that, although he was not to participate in any meetings with institutional investors, Mr. Milton should speak to retail investors and that Mr. Milton's ability to connect to retail investors was tremendously valuable to the Company. For example, in late 2019 or early 2020, Mr. Milton, Russell, Brady, and Nikola's bankers attended a meeting with Softbank, a potential institutional investor. After the meeting, Russell and Brady told Mr. Milton that he should not meet with institutional investors, because those investors were more interested in understanding the financials of the Company than in being sold on Mr. Milton's vision for Nikola. After this meeting, Mr. Milton heeded Russell's and Brady's advice and did not meet with institutional investors as Russell and Brady requested.

64.     However, Russell and Brady continued to acknowledge the importance of Mr. Milton speaking to and connecting with retail investors.  In a text message exchange on or about July 10, 2020 between Russell and Brady, to which Mr. Milton was not privy, Brady stated that "Trevor's style works for retail investors speculating with a few dollars they should probably put in a 401k index fund." Russell agreed, responding that he "[c]ouldn't agree more. Not sure if Trevor will change. I am grateful that we are a public company even with all the pressure. I don't think we would have raised addition[al] capital from institutional investors as a private company. His style is very polarizing for institutional

investors."  Consistent with the Company's media strategy, Russell and Brady did not believe that Mr. Milton should refrain from engaging with retail investors.

65.     However, beginning on or about June 6, 2022 and thereafter, Mr. Milton started to learn that the Company and the Individual Defendants privately had concerns about Mr. Milton speaking on behalf of the Company.  For example, at Mr. Milton's criminal trial, Russell testified that the reason Russell wanted to be Nikola's Chief Executive Officer in the first place was because he was "concerned about [Mr. Milton's] public statements."  Russell testified that he told Mr. Milton that Mr. Milton's public statements were "the equivalent of a press release or a filing" and that Russell was "focused on making sure that his [own] public statements were as vetted and true and correct as our press releases and our securities filings."

66.     Despite these concerns, Russell also admitted at Mr. Milton's criminal trial that he kept his head in the sand with respect to what Mr. Milton was saying publicly about the Company.  Russell admitted that he was not on social media and that he did not review Mr. Milton's social media posts, statements, or podcasts even though employees who reported to him provided him with concerns that needed to be addressed.

**D.     Nikola's Internal and External Public Relations and Marketing Teams Schedule Mr. Milton for Interviews**.

67.     Consistent with the Company's and the Individual Defendants' media strategy of having Mr. Milton be the public face of Nikola, the Company, over and over again scheduled interviews, some of them nationally televised, for Mr. Milton to appear and represent the Company.  These interviews continued through September 9, 2020.

68.     Colleen Robar ("Robar"), Nikola's long-time external public relations consultant, and Nicole Rose ("Rose"), Nikola's Director of Public Relations, along with other members of Nikola's internal marketing team, scheduled interviews for Mr. Milton and provided feedback on his performances.  For example, in an email to Mr. Milton, Russell and others at Nikola after Mr. Milton appeared on FOX Business in December 2020, Robar wrote, "Nice job Trevor!  Let's book some more national TV."

69.     Many of the interviews that Robar and Rose scheduled for Mr. Milton are ones in which the Government later alleged that Mr. Milton made misstatements, including:

      a.     A Fox Business interview, released in February 2020;

      b.     An interview with Transport Topics, released in March 2020;

      c.     The Truck Show podcast, released in April 2020;

      d.     An interview with JMac Investing, released in May 2020;

      e.     The Tesla Daily podcast, released in June 2020;

      f.     An interview with CNN, released in June 2020;

      g.     An interview with CNBC, released in June 2020;

      h.     The Hitting the Mark podcast, released in July 2020;

      i.     The Chartcast with TC & Georgia ("Tesla Charts") podcast, released in July 2020; and

      j.     An interview with TD Ameritrade, released on September 9, 2020.

70.     Mr. Milton taped some of these interviews from Nikola's Phoenix, Arizona headquarters in a media room located on the same floor as Mr. Milton's, Worthen's, Brady's, and Russell's offices.

71.     Nikola's marketing team sent monthly social media reports to Russell, Brady, Worthen, and others at Nikola.  Those reports described in detail any interviews that Mr. Milton and others had given during the month.  The Company and the Individual Defendants, including Russell, Brady, and Worthen, knew, or were on notice and should have known, that Mr. Milton regularly gave interviews.  Neither the Individual Defendants nor anyone else at the Company directed Robar or Rose to stop scheduling Mr. Milton for interviews.  Instead, the Company and the Individual Defendants encouraged Mr. Milton to continue to be interviewed and to speak about the Company, its vision, and its products.

**E.     Mr. Milton Asks Chief Legal Officer Worthen and Others To Review and Approve His and the Company's Public Statements**.

72.     As Nikola's Chief Legal Officer with a self-professed background in securities law, Worthen had a duty to ensure that Nikola and its officers and directors made

accurate disclosures.  Shortly before Nikola became a publicly traded company, Mr. Milton wanted to ensure that he did not misspeak or otherwise run afoul of the securities laws.  At that time, and continuing throughout Mr. Milton's tenure at Nikola, Mr. Milton sought assistance from Worthen.  For example, on March 2, 2020, in an email with the subject line "Okay with this language for social media," Mr. Milton sent Worthen a draft social media post regarding the VectoIQ merger, and asked, "Who is [sic] our SEC attorneys? I need approval on stuff."  Mr. Milton even went on to ask the Company for an outside securities law attorney to ensure that his public statements were accurate.

73.     Mr. Milton expected Worthen to review and approve his and the Company's public statements to ensure that Mr. Milton's statements were accurate, and in turn, expected that Worthen would provide honest and accurate legal advice.  During a June 2020 lunch with Nikola fans, Mr. Milton introduced the fans to Worthen and described exactly how he viewed Worthen's role:  Mr. Milton stated that Worthen was there "to make sure [Mr. Milton and the Company] don't get in trouble . . . [and] that no questions [were] answered . . . that could put [Mr. Milton and the Company] in trouble."

74.     Mr. Milton not only expected Worthen to keep appraised of, review, and approve his public statements, but Mr. Milton affirmatively consulted Worthen about the accuracy of his and the Company's statements, and in some cases, asked Worthen to pre-approve those statements.  For example:

a.     In response to a January 1, 2020 text from Mr. Milton to Worthen, in which Mr. Milton asked whether Worthen saw "any issues" with a tweet, Worthen told Mr. Milton, "***You walk that line very well***."

b.     In March 2020, Mr. Milton informed Stephanie Amzallag ("Amzallag"), Nikola's social media manager, that he "***had [GC] Britton [Worthen] on the line helping [him] draft" a tweet***."

c.     In a May 27–28, 2020 email chain between Worthen, Russell and Mr. Milton regarding Mr. Milton's edits to a press release, Mr. Milton ***sent it back to Worthen for review and approval***.

d.      On June 10, 2020, Mr. Milton sent a text message to Worthen in which Mr. Milton asked, "***Can I tweet*** something like . . . or something along those lines?"

e.      On June 19, 2020, Mr. Milton sent a text message to Worthen with a proposed social media post and asking, "***[i]s this accurate before I send****?"*

f.      In a June 29, 2020 email chain between Mr. Milton, Worthen, and Vince Caramella ("Caramella"), Nikola's Chief Marketing Officer, Mr. Milton provided edits to a June 29, 2020 Nikola press release announcing the opening of reservations for the Badger "***to address Britton's concerns***."

g.      On June 30, 2020, Mr. Milton issued a tweet regarding the Badger reservations in which he explained, "I can't comment on when I'll announce the numbers. ***There are all kinds of legal hoops I have to clear to talk about revenue***."

h.      On August 26–27, 2020, Mr. Milton emailed with Worthen and others regarding an upcoming press release.  Mr. Milton stressed that he "***would like Britton to go through this first***" before the press release was uploaded.  Mr. Milton further emphasized that he "***need[ed] to get Mark Russell to sign off on it and go through it***."

75.      A June 9, 2020 text message exchange between Mr. Milton and Worthen regarding a tweet that Mr. Milton posted is particularly indicative of Mr. Milton's reliance on Worthen to ensure Mr. Milton was not breaking any laws and of Mr. Milton's understanding that Worthen, or someone at his direction, was monitoring and approving his public statements.  Worthen sent Mr. Milton a screenshot of a tweet that Mr. Milton posted about the Badger "already" being produced and told Mr. Milton "***to be careful***."  Presumably, Worthen told Mr. Milton to "be careful" because, although the two Badger prototypes already were being assembled in June 2020, the prototypes had not yet finished being assembled.  Mr. Milton sought reassurance from Worthen, asking, "***so legally I'm OK***.  But I'll be more clear next time."  Worthen responded, "***Agree.  I knew what you meant***."  When Mr. Milton directly asked Worthen if the tweet legally was permissible, Worthen agreed with Mr. Milton and did not advise Mr. Milton to remove, clarify or

1    otherwise contextualize the tweet.  The Government later would allege that Mr. Milton

2    made misstatements in the same tweet that Worthen, the Company's Chief Legal Officer,

3    approved.

4         76.    Worthen's advice was so important to Mr. Milton that Mr. Milton delayed

5    releasing public statements until Worthen had a chance to review and approve the statement.

6    For example, in an email on or about February 27, 2020 from Mr. Milton to Craig Gridelli

7    from Cowen Inc., an investment bank now known as TD Cowan, on which Mr. Milton

8    copied Girsky, Russell, Brady, and others about a draft script for an upcoming investor call,

9    Mr. Milton explained, "*We are going to have to postpone this [call].  No way to get legal*

10   *to sign off on this and everyone's comments before 330*."

11        77.    Mr. Milton not only sought approval from Worthen to ensure his public

12   statements were accurate, but he also asked to clear certain statements with Russell and

13   Brady.  For example:

14            a.    In an email on or about February 11, 2020, Mr. Milton responded to

15        Fiat Chrysler's request for a chart concerning Nikola's electrical architecture:

16        "[H]appy to do it and jump.  *I just have to have all the teams review it and team*

17        *members be part of it to ensure it is accurate.*"

18            b.    On or about June 1, 2020, Mr. Milton emailed Caramella regarding a

19        list of questions concerning a Nel/Nikola press release and copied Russell, Brady,

20        Worthen, and others.  Mr. Milton suggested to Caramella, "Let's all catch up on

21        these questions.  *I will follow up with Mark [Russell] to ensure we get the right*

22        *message out back to you.*"

23            c.    After Mr. Milton asked Rose to postpone recording an interview for

24        the Tesla Charts podcast so he could have "time to get data and prepare for this one,"

25        on or about July 15, 2020, Mr. Milton asked the marketing team to email Tesla Charts

26        prior to his podcast interview.  Mr. Milton wanted to know whether the podcast hosts

27        would ask any specific financial questions because "I'll need to make sure *I clear it*

28        *with the CFO on how to respond.  Those questions are very technical and have to*

*do with filings so I'll need any of those questions beforehand so that the CFO can help me ensure I'm giving accurate data.*"

78. Because Mr. Milton consistently sought the advice of the knowledgeable Individual Defendants, such as Worthen, Brady, and Russell—all of whom had vastly more experience running a company, and particularly a public company, than Mr. Milton—and others at the Company, Mr. Milton heeded their advice when they provided it. In an email on or about June 18, 2020 from Worthen to Mr. Milton suggesting that Mr. Milton not schedule a particular interview, Mr. Milton responded, "K. Agree with you." In early 2020, after Russell and Brady told Mr. Milton that he should not attend meetings with institutional investors, Mr. Milton abided by their advice.

**F.      The Individual Defendants and Others at Nikola Tell Mr. Milton He Is Doing a Great Job**.

79. Mr. Milton overwhelmingly received positive feedback on his interviews from all levels at Nikola. For example, Russell, Brady, and Worthen each praised Mr. Milton following certain media appearances. During some of these appearances, Mr. Milton later was alleged to have made misstatements.

a.      On or about December 17, 2019, Worthen sent a text message to Mr. Milton, stating "Just saw the fox business piece - ***great job!! Well done my friend***." The following day, regarding the same Fox Business interview, Robar told Mr. Milton, "***Nice job Trevor! Let's book some more national TV***." Caramella agreed, stating "***Nice job Trevor***…" Russell subsequently responded to the same email chain, stating, "Wow.  I don't see how that could have gone better**.  *Very well handled, Mr. Chairman***…"

b.      On or about April 24, 2020, following an interview Mr. Milton gave on NBC Universal, Robert Frank of NBC Universal wrote to Rose, "***That was FANTASTIC!!***  Especially [Trevor's] last point that nobody knows the ups and downs, and what it means to have nothing, better than him!  Thank you and please pass along my thanks to Trevor!!"  Ms. Rose forwarded the note to Mr. Milton,

copying Russell, Brady, and Worthen, writing "***Trevor, huge win for all.***  Robert literally sent me this note seconds after you went off the air.  That is saying something.  Especially since he was holding firm on trying to take you down another path.  ***Excellent job.***"  Russell responded, "***Awesome*** – would have bet against him being won over like that.  ***Nice job, Trevor.***"

       c.      On or about June 19, 2020, Russell sent a text message to Mr. Milton in which Russell praised Mr. Milton for an interview Mr. Milton gave to CNN. Russell stated, "***Just caught your CNN interview.  You have always had a gift for battle in the war of ideas . . . . But you have clearly worked and focused yourself to a whole other level***."  The Government later alleged that Mr. Milton made misstatements about hydrogen in the same interview.

       d.      On or about June 25, 2020, in an email to Mr. Milton and others regarding an "Observer Story," Brady stated, "***Great interview!!***"  The Government later alleged that Mr. Milton made misstatements about hydrogen in the same interview.

80.      The marketing team, often copying Russell, Brady, and Worthen, similarly told Mr. Milton he was performing well in interviews.

       a.      In an email on or about July 4, 2020 from Robar to Mr. Milton, Russell, Brady, Worthen, and others, with the subject line as "Hitting the Mark Podcast," Robar included a link to the podcast and wrote, "This just went live today," and "***Good job Trevor!***"  The Government later alleged that Mr. Milton made misstatements on the same podcast.

       b.      On or about July 19, 2020, following the release of the Tesla Charts podcast, Rose emailed Mr. Milton, observing that there was *"**an abundance of great content, quotes and facts**"* and that it was "***[t]ruly a phenomenal interview***" in which Mr. Milton "explained where hydrogen makes sense and why it isn't about efficiency but rather cost per mile in incredibly simplistic and factual terms." Caramella echoed that sentiment, stating that it was a "***great***" podcast.  Mr. Milton

later was alleged to have made misstatements on the same podcast, specifically about hydrogen.

c. On or about July 31, 2020, in an email from Robar to Mr. Milton, Russell, Brady, Worthen, and others, she stated, "Here's the link to watch Mr. Milton's interview on Barron's Roundtable that just aired on FOX Business . . . ***Nice job Trevor!***"

**G. Chief Legal Officer Worthen Tells Bloomberg News That Mr. Milton "Never Deceived Anyone."**

81. Worthen went even farther than merely congratulating Mr. Milton on a job well done. In fact, Worthen publicly supported Mr. Milton. On one occasion, Worthen threatened to sue a publication for statements it made about Mr. Milton involving the Nikola One.

82. A June 2020 article by Edward Ludlow of Bloomberg News ("Bloomberg") contained allegations that Nikola exaggerated the Nikola One prototype's capabilities in 2016, including that Mr. Milton stated at a December 2016 event to unveil the Nikola One that the prototype was "a fully functioning vehicle" when it was not fully functioning. Mr. Milton later was alleged to have made misstatements in the article and in his subsequent social media posts defending himself and Nikola.

83. Worthen sent a letter threatening to sue Bloomberg, one of the world's largest media companies, for "libel related to the defamatory comments about Mr. Milton." In that letter, Worthen stated that "Nikola stands by its products and the statements of its founder, Mr. Milton," and that Mr. Milton "***never deceived anyone***" and claimed the Bloomberg article was "inaccurate, misleading, [and] taken out of context" in an attempt to "wrongfully harm" the Company.

**H. "Silent Disagreement is Unproductive": The Defendants Fail To Take Action When Confronted With Potential Ambiguities in Mr. Milton's Public Statements**.

84. Nikola's Employee Handbook, which Worthen drafted in late 2019 and that Russell called "by far the best employee handbook [he had] ever seen," encouraged "open and free communication," and stressed that "***[s]ilent disagreement is unproductive***."

Employees were "obligated" to report potential wrongdoing, and a failure to do so could result in discipline.

85.    After Nikola went public, the Company formulated a procedure for reviewing Mr. Milton's public statements.  Mr. Milton also requested specifically that an outside securities attorney review Mr. Milton's and the Company's public statements to ensure investors received accurate information.  Instead, Worthen tasked Amzallag, Nikola's Social Media Manager who then was in her twenties and had no public company experience, with monitoring Mr. Milton's interviews and social media posts and reporting any potential inaccuracies to Caramella and Worthen.  After Amzallag notified Caramella and Worthen of any potential ambiguities, Worthen was responsible for escalating any concerns to either Russell or Brady, who in turn would raise any concerns to the Post-Merger Board.

86.    On several occasions between June and August 2020, during the same time period in which Russell, Brady, Worthen, and others at the Company encouraged and praised Mr. Milton for his public statements, certain Nikola employees made Russell, Brady, and Worthen aware of certain statements that Mr. Milton made in interviews and on social media and raised concerns that the statements potentially were confusing or ambiguous.  Mr. Milton was excluded from these conversations and never knew about them until after the fact.  If Mr. Milton had known about these potential ambiguities, he would have clarified them.  Neither Worthen, nor Brady, nor Russell took any action to speak with Mr. Milton about these potential ambiguities in those statements, or otherwise to contextualize or correct the statements publicly.  The Government later alleged that these potentially confusing and ambiguous statements were material misstatements and indicted Mr. Milton for making them—an outcome that would have been avoided if Russell, Brady, or Worthen, or the Company had alerted Mr. Milton that his statements should be clarified. In other words, the Company's executives hid any issues behind Mr. Milton's back while congratulating him on a job well done and then later scapegoated Mr. Milton and assisted in getting him indicted for those very issues that they never brought to his attention.

87.    In some instances, Mr. Milton understood that Worthen had the opportunity

to review and approve Mr. Milton's interviews before they were published, and Mr. Milton reasonably believed that Worthen had reviewed and approved those interviews. The Government later alleged that Mr. Milton made material misstatements in those interviews that Worthen reviewed and approved. Beginning on or about June 6, 2022 and thereafter, Mr. Milton started to learn that Worthen, in fact, approved the publication of the interviews but never reviewed them.

88.     Nikola's actions—or inactions—in responding to Mr. Milton's appearance on the Tesla Charts podcast, with respect to which Mr. Milton later was alleged to have made material misstatements about Nikola's hydrogen production plans and capabilities, are particularly illustrative:

a.     On or about July 17, 2020, Mr. Milton recorded an interview on the Tesla Charts podcast. On July 18, 2020, the Nikola marketing team received a pre-publication recording of the interview. After the marketing team sent the recording to Mr. Milton, Mr. Milton responded, "***I'll just leave it up to you guys to listen to it and approve*** it or if there's issues you can let me know when I can go listen to a certain segment of it."

b.     Rose reviewed the podcast and forwarded a clip of the podcast to Worthen with the subject line "*IMMEDIATE APPROVAL NEEDED*: Tesla Charts Podcast." Worthen approved the podcast to be released, and Rose contacted the podcast hosts and told them that they could publish the interview.

c.     After Mr. Milton's interview on the Tesla Charts podcast was published on or about July 19, 2020, Nikola's marketing team posted a link to the interview on Nikola's Twitter account, widely disseminating the podcast to Nikola's many followers, including investors:



d.      Rose and Caramella heaped praise on Mr. Milton's appearance, telling Mr. Milton that it was "*[t]ruly a phenomenal interview*" and "*one of [his] best so far. Nice job!*"  The last and only thing Mr. Milton was told about his performance in the interview was that he did a "nice job."

e.      Unbeknownst to Mr. Milton, that same day, Elizabeth Fretheim ("Fretheim"), Nikola's Head of Business Development, listened to Mr. Milton's interview on the Tesla Charts podcast and then sent a link to the podcast in a group text message to Russell, Brady, and Worthen while leaving Mr. Milton out of the text messages.  Fretheim stated that she was "*really worried about some of what Trevor says on his latest podcast*.  In particular about contracts with utilities, getting power straight from federal lines, cost of stations, that we have already purchased land for stations and on.  *I asked the marketing team to remove references to it until it is properly reviewed by the right people*."  Neither Russell nor Brady nor Worthen responded to Ms. Fretheim's text messages about those statements, which ultimately

1    resulted in Mr. Milton's indictment for making material misstatements.

2            f.      After Fretheim did not receive any response from Russell, Brady, or

3    Worthen, Fretheim sent a subsequent message in which she stated that she was

4    "[j]ust letting you know *the references are going to stay live [on Nikola's social*

5    *media] until they get direction from you* which is understandable."  Again, Russell,

6    Brady, and Worthen did not respond, breaching their fiduciary duties, and on the part

7    of Worthen, failing to protect Mr. Milton and the Company from legal liability.  Had

8    Russell, Brady, and Worthen done their jobs and told Mr. Milton about any of

9    Fretheim's or other concerns with the Tesla Charts podcast, Mr. Milton would have

10   immediately clarified those ambiguities like he had with any concern the Company

11   or the Individual Defendants had raised with him in the past.

12           g.      On or about the evening of July 19, 2020, Fretheim sent herself a

13   detailed list of potential inaccuracies in Mr. Milton's statements during the interview

14   on the Tesla Charts podcast.  Fretheim's list included statements about Nikola's

15   hydrogen production plans and capabilities, along with time stamps corresponding

16   to the time in the interview at which Mr. Milton made the relevant statements.  On

17   July 20, 2020, Fretheim forwarded the list to Nikola's marketing team, including

18   Caramella and Rose.  In Fretheim's email, she stated that "[this list] is rough but

19   below are things I just wish he wouldn't say to things that are more

20   concerning."  Caramella thanked Fretheim for sharing her concerns, but did not

21   commit to taking, and indeed did not take, any subsequent action with respect to

22   Fretheim's concerns.

23           h.      On or about July 19, 2020, Rose emailed Caramella separately, stating

24   that she did not necessarily agree with Fretheim's assessment because there was

25   more context around each of Mr. Milton's statements than what Fretheim had

26   observed, but that she found Fretheim's feedback helpful to consider how Mr.

27   Milton's statements could be misconstrued.  Rose then told Caramella that she was

28   curious to hear if Russell or Worthen had concerns about the interview.

i.      Still having received no response from Russell, Brady, or Worthen to her earlier text messages, Fretheim separately emailed her list of statements about which she was concerned (and the relevant time stamps) to Russell and Worthen.

j.      Less than an hour after Fretheim emailed Russell and Worthen, Worthen spoke with Mr. Milton by phone for approximately five minutes and spoke to Mr. Milton again by phone that evening for approximately seven minutes. Worthen did not discuss with Mr. Milton any concerns that Worthen had with respect to Mr. Milton's statements on the Tesla Charts podcast.

k.      On the evening of July 20, 2020, Russell forwarded Fretheim's email to both Worthen and Brady, but not to Mr. Milton or the Post-Merger Board.

l.      Russell later admitted at Mr. Milton's criminal trial in September 2022, and Mr. Milton then learned, that Russell never even bothered to listen to the podcast, not even the minute markers that Fretheim specifically had flagged for Russell, Brady, and Worthen.

m.      Russell later admitted in testimony at Mr. Milton's criminal trial, and Mr. Milton then learned, that Russell had no specific recollection of speaking with Mr. Milton about the Tesla Charts podcast.  Russell had no recollection of telling Mr. Milton that anything he said on the Tesla Charts podcast was inaccurate.  Russell also testified and admitted, and Mr. Milton then learned, that Russell generally did not listen to or review any of Mr. Milton's interviews even though employees sent links and text messages to him asking him to review the interviews.

n.      Ten days later, on or about July 20, 2020, Worthen forwarded Fretheim's email to Caramella and Rose and asked for a transcript of the interview. Rose subsequently provided the transcript.  Beginning on or about June 6, 2022 and thereafter, Mr. Milton started to learn that Worthen never reviewed the transcript or listened to the podcast.  Had Worthen and others at the Company acted appropriately, Mr. Milton would have clarified those statements immediately and the Government never would have alleged those statements to be material misstatements or indicted

1    Mr. Milton based upon them.

2    89.    Russell's, Brady's, Worthen's, and the Company's failure to act in light of

3    clear red flags of potentially confusing or ambiguous statements by Mr. Milton about Nikola

4    is irreconcilable with either the Company handbook or their fiduciary duties to the

5    Company.  Each was aware of potentially ambiguous statements Mr. Milton made during

6    the Tesla Charts podcast.  Each was aware that the podcast would remain "live" until they

7    instructed the marketing team otherwise.  As Mr. Milton later learned, at the earliest on June

8    6, 2022 and thereafter, **neither Russell, nor Brady, nor Worthen, nor any other member**

9    **of the executive team instructed Nikola's marketing team or Mr. Milton to stop**

10   **promoting the podcast, to remove the podcast from social media, or to issue a**

11   **corrective statement.**  Although Nikola's marketing team and other Nikola employees at

12   the Company followed the Company's procedure for reviewing and escalating issues

13   regarding Mr. Milton's public statements, Russell, Brady, Worthen, and the Company failed

14   to take any subsequent action, or alerting Mr. Milton so he could clarify them, breaching

15   their fiduciary duties.

16   90.    The Tesla Charts podcast was not the only instance where Nikola's marketing

17   team asked Worthen to review or approve one of Mr. Milton's public statements.  For

18   example, on or about May 28, 2020, at Rose's suggestion, Mr. Milton recorded an interview

19   with the JMac podcast.

20   91.    Before Mr. Milton recorded the interview, the JMac podcast host told Rose

21   that "[t]he questions we would discuss could be vetted up front by your lawyers/staff and

22   could be pre-edited and reviewed by you all before uploading."  After Mr. Milton recorded

23   the podcast and at the direction of Rose, the podcast host sent Rose a copy of the interview

24   as promised, asking Rose to approve the podcast before it was published.

25   92.    On or about May 28, 2020, Rose forwarded the interview to Worthen.  On or

26   about May 29, 2020, after Rose and Worthen corresponded about the interview, JMac

27   published the interview.  The Government later alleged that Mr. Milton made material

28   misstatements regarding Nikola's reservations during his interview on the JMac podcast,

1    again, a result that would have been avoided if Worthen actually had reviewed the podcast

2    and fulfilled his duties as Chief Legal Officer.

3        93.    On or about June 8, 2020, again following the Company's known procedure

4    for escalating potentially problematic public statements, Amzallag sent a text message to

5    Worthen to give him a "head's up" about a tweet that Mr. Milton had posted.  In response

6    to a Twitter user asking Mr. Milton when the first Badger prototype would be produced,

7    Mr. Milton had responded "already."  Amzallag included a screenshot of the tweet in her

8    text message to Worthen.  As described above, although Worthen raised the tweet to Mr.

9    Milton, Worthen assured Mr. Milton that Mr. Milton was "legally OK" and that Mr. Milton

10   did not need to take any action to clarify the statement.  Beginning on or about June 6, 2022

11   and thereafter, Mr. Milton started to learn that Worthen believed the tweet to be ambiguous

12   at the time.  The Government later alleged that Mr. Milton made a misstatement in that

13   same tweet and indicted Mr. Milton based on that tweet, again a result that could have been

14   avoided if Worthen had provided the sound and accurate legal advice that Mr. Milton

15   requested from a seasoned securities lawyer, or had told the Government that he approved

16   the tweet and saw no issue with how it was worded.

17       94.    Similarly, on August 3, 2020, Amzallag emailed Fretheim with respect to a

18   tweet from Mr. Milton regarding the cost of hydrogen.  Amzallag asked Fretheim, "[I]s this

19   information accurate?  I know we've been communicating under 4 kg, but just want to

20   clarify with his other comment on this."  Fretheim forwarded Amzallag's email to Worthen.

21   Worthen took no action in response to this tweet.  The Government later alleged that Mr.

22   Milton made similar types of misstatements about hydrogen costs and indicted Mr. Milton

23   based on those misstatements.

24       95.    Beginning on or about June 6, 2022 and thereafter, Mr. Milton started to learn

25   that, despite being alerted over and over again to specific instances between June and

26   August 2020 where Mr. Milton's public statements potentially could have been interpreted

27   as confusing or ambiguous, the Company, Worthen, Russell, and Brady took no action,

28   even when presented with clear opportunities to do so, such as raising concerns to the Post-

Merger Board or Mr. Milton so that the statements could be clarified.

96.     For example, Nikola held its first Board meeting as a public company on July 24, 2020, just four days after Fretheim relayed concerns to Russell, Brady, and Worthen about certain statements Mr. Milton made in his interview on the Tesla Charts podcast. Russell, Brady, and Worthen all attended the Board meeting.  According to Russell's September 2022 trial testimony, at that Board meeting, Mr. Milton "talk[ed] about his ability to communicate through social media and reach out to retail investors and how that was help driving the stock price up." Yet, none of the Individual Defendants or anyone else at the Company, raised either the potentially confusing or ambiguous statements that Mr. Milton made during his interview on the Tesla Charts podcast, or how, if at all, the Company would or should correct those statements.  The Post-Merger Board did not discuss Mr. Milton's statements, and no one—included Russell, Brady, and Worthen—suggested or recommended that Mr. Milton stop using social media or that he correct or clarify any of his public statements.

97.     Following the July 24, 2020 Board meeting, sometime in late July or early August 2020, there was an apparent discussion between Mr. Milton and  Russell, Brady, and Worthen that took place in Worthen's office at Nikola's Phoenix, Arizona headquarters. This meeting was neither recorded nor otherwise memorialized.  According to Russell's September 2022 trial testimony, they discussed generally Mr. Milton's usage of social media.  However, neither Russell, nor Brady, nor Worthen told Mr. Milton that he potentially misspoke or was ambiguous in his statements, or otherwise advised Mr. Milton to correct or clarify any of his public statements.

98.     Mr. Milton later learned that certain Individual Defendants believed in 2020 that Mr. Milton was making misstatements and potentially exposing Mr. Milton and the Company to liability.

I.      **Nikola Does Not Issue Any Corrective Disclosures Related to Any Potential Ambiguities in Mr. Milton's Public Statements, But Instead Continues To Promote Mr. Milton's Statements on the Company's Social Media Platforms**.

99.     Prior to September 10, 2020, the Defendants did not issue any oral or written statements addressing, let alone correcting, modifying, or contextualizing, any of Mr. Milton's potentially ambiguous statements.

100.    To the contrary, after Nikola went public in June 2020, Nikola consistently posted Mr. Milton's interviews to its own social media accounts.  Nikola's social media accounts had a considerable following, which allowed Mr. Milton's statements to be broadcast to a much wider audience.  Nikola continued to post and promote Mr. Milton's interviews through September 2020.  The Company and the Individual Defendants failed to direct the marketing team, to the extent they did promote Mr. Milton's interviews, to provide appropriate disclaimers or to contextualize Mr. Milton's statements, for example, by stating that Mr. Milton was speaking about Nikola's future plans.  Indeed, many of the interviews containing statements that the Government alleged to be misstatements remained posted for months and even years following Mr. Milton's departure from the Company.

III.    **SEPTEMBER 10–20, 2020: THE HINDENBURG REPORT.**

A.      **The Company Defends Itself and Mr. Milton Following the Release of the Hindenburg Report**.

101.    On September 10, 2020, Hindenburg issued the Hindenburg Report, in which Hindenburg asserted that various statements made by Mr. Milton and the Company were false and that Nikola was an "intricate fraud built on dozens of lies over the course of its Founder and Executive Chairman Trevor Milton's career."[4]  Hindenburg disingenuously compared Nikola to Theranos, Elizabeth Holmes's failed blood-testing company that was ultimately revealed to be little more than a shell game and which never had much of a functioning product at all.

---

[4]     *Nikola: How to Parlay an Ocean of Lies Into a Partnership With the Largest Auto OEM in America*, Hindenburg Research (Sep. 10, 2020), https://hindenburgresearch.com/nikola/.

102.    Nikola immediately hired the law firm of Kirkland & Ellis LLP ("Kirkland"), the law firm at which Russell previously practiced law, to advise the Company and undertake an internal investigation.  Initially, Nikola truthfully and vigorously denied the accuracy of Hindenburg's allegations, including in press releases that were vetted by the Post-Nikola Board, Defendants, and by Kirkland, and issued with their authorizations.

103.    In a press release issued on or about September 11, 2020, the day after the Hindenburg Report was released, Nikola stated, "Yesterday, an activist short-seller whose motivation is to manipulate the market and profit from a manufactured decline in our stock price published a so-called 'report' *replete with misleading information and salacious accusations directed at our founder and executive chairman [Trevor Milton]*.  To be clear, this was not a research report and it is not accurate.  This was a *hit job* for short sale profit driven by greed."

104.    Between September 11th and 13th, 2020, the Company, together with Kirkland and an external crisis management firm Joele Frank, drafted a detailed rebuttal report to the Hindenburg Report (the "Nikola Rebuttal Report").  During the process of drafting the Nikola Rebuttal Report, Mr. Milton, *over the objections of others*, insisted that Nikola provide complete transparency about the Nikola One prototype rolling down the hill.  Mr. Milton stated in an email, "I will be making one change you won't be super excited about since we disagree on this point, but it's my call as chairman and I feel it is important for me to do so.  It is important for us to own the truck rolling 100% and not divert away from it as that's the truth and that's what we always reported.  I will add language to completely own it and make it our ally, not enemy."  Thompson agreed with Mr. Milton's conclusion, stating that "*Hindenburg's report created a misleading narrative that has been perpetuated to its benefit as a Nikola short . . . All Investors knew the truck was NOT a fully functioning truck in the video*, *and it was promotional piece to share a vision of the future*."  The Post-Merger Board approved the Nikola Rebuttal Report before it was published.

105.    On or around September 14, 2020, Nikola issued the Nikola Rebuttal Report,

stating that the Hindenburg Report was "false and defamatory" and included many "false and misleading statements regarding the Company's operations and multi-year, groundbreaking R&D efforts." The Nikola Rebuttal Report denied and contextualized some of the Hindenburg Report's specific falsehoods, stating that Mr. Milton's and the Company's statements about the Nikola One prototype were not false; the Nikola One prototype was not a "pusher"; that Hindenburg distorted the "In Motion" video; that the "In Motion" video was neither misleading nor material; that Hindenburg "intentionally underestimates" Nikola's hydrogen production capabilities; and that Nikola had been "designing, engineering, and working" on certain component parts in-house for "quite some time."

106.   With respect to Hindenburg's claims about the Nikola One prototype, the Nikola Rebuttal Report stated that "Hindenburg seeks to portray Nikola as misrepresenting the capabilities of the Nikola One prototype in a 2017 video produced by a third party, as 'simply filmed rolling down a big hill' . . . Nikola described this third-party video on the Company's social media as 'In Motion.'  It was never described as 'under its own propulsion' . . . Nikola investors who invested during this period, in which the Company was privately held, knew the technical capability of the Nikola One at the time of their investment."  More importantly, the Nikola Rebuttal Report further explained that the "***three-year-old video of a Nikola prototype is irrelevant except for the fact that the short seller is trying to use it for its main thesis.  The fact is, Nikola has real working hydrogen fuel-cell powered semi-trucks.  Any reports intended to suggest that Nikola's trucks do not drive are erroneous***."

**B.    The Officers and Directors Defend Mr. Milton and Nikola in the Immediate Aftermath of the Hindenburg Report**.

107.   Not only did the Company defend itself in the Nikola Rebuttal Report, but certain Individual Defendants also publicly defended Mr. Milton and the Company in public remarks, including remarks to financial analysts who reported on Nikola that certain Individual Defendants delivered in the days following the Hindenburg Report, focusing on the misleading nature of the Hindenburg Report's claims, contextualizing the false

allegations, and stressing that Nikola was a real company with real products.

108.   For example, on or around September 14, 2020, Brady participated in a "fireside chat" at the RBC Capital Markets Global Industrials Virtual Conference.  When asked to address the so-called "elephant in the room," *i.e.*, the Hindenburg Report, Brady fully and firmly stood behind the Nikola Rebuttal Report.  Brady responded that "the response speaks for itself" and that the response was "comprehensive and hopefully [ ] will be helpful to investors as [Nikola] think[s] about what we have in front of us."[5]  Brady also stated that Nikola's partners were "offended" by the Hindenburg Report because it suggested that they were "hoodwinked," which was "ridiculous."  Brady elaborated that he thought it was "offensive to [Nikola's] strategic partners that you have a short seller who's doing a ***hack job***, and essentially point[ing] fingers at our strategic partners that they don't know what they're doing . . . they . . . [did a] much more deep dive than what any third party short seller would have been able to perform."  Brady also addressed Nikola's use of component parts, stating that, with respect to the Nikola Tre, Nikola was responsible for "15% of [the] component parts that represent 90% of the value[,]" including "the battery, e-axle, e-motors, inverters, BMS system, infotainment system, [and] vehicle controls."

109.   On September 15, 2020, Ubben expressed to a reporter for the Financial Times similar views as those expressed the day earlier by Brady.  The Financial Times article related that "Mr. Ubben . . . bristled at Hindenburg's comparison of Nikola to Theranos, the failed blood-testing start-up . . . .  Mr. Ubben called the comparison 'absolutely absurd' because Nikola now has a working vehicle."[6]  Ubben also stated, "How can this be an intricate fraud if you have your three biggest suppliers in the board room working together as partners?  I don't get why there's so much suspicion . . . You think

---

[5]   SA Transcripts, *Nikola Corporation (NKLA) Management Presents at RBC Capital Markets Global Industrials Virtual Conference (Transcript)*, Seeking Alpha (Sept. 14, 2020), https://seekingalpha.com/article/4374216-nikola-corporation-nkla-management-presents-rbc-capital-markets-global-industrials-virtual.

[6]   Ortenca Aliaj, FINANCIAL TIMES, *Nikola Board Member Defends Company Against Fraud Claims*, (Sept. 16, 2020).

1  Bosch, CNH [Iveco], Hanwha and now General Motors?  They just rolled over without

2  doing due diligence?  No."[7]

3      110.  The same day, Russell spoke at Morgan Stanley's 8th Annual Virtual Laguna

4  Conference.  When Russell was asked about Nikola's component parts, Russell explained

5  that Nikola "has been pleased to collaborate with [partners] on developing unique parts that

6  we're providing for our vehicles, which are those core parts, the software controls, the

7  batteries, eAxles, inverters, infotainment systems.  That's the way it works."  Russell further

8  explained that Nikola has "***exclusivity on anything that we have designed and anything***

9  ***that we have a patent or shared patent with***."[8]  Regarding electricity rates that Nikola was

10  able to obtain, Russell stated that on Interstate 10 "***we get super cheap electricity . . . I can't***

11  ***comment on the specific [power purchase agreements], because we have to keep those***

12  ***confidential . . .***"

13      111.  Russell also was invited to address the Hindenburg Report's allegations, and

14  specifically the allegation that Nikola did not have a working hydrogen truck.  Russell

15  responded, "We absolutely do have hydrogen trucks.  We have two hydrogen fuel cell

16  trucks that have been on the track for many hours.  I've ridden [in] them many times."

17  Russell continued, "***The allegations that were put out there about that very early stage***

18  ***[Nikola One] prototype . . . we were still messing around with natural gas versus hydrogen***

19  ***in those days, this is years ago.  And they still want to poke holes in that early stage***

20  ***prototype . . .  So they're pointing at that early stage prototype as somehow undermining***

21  ***our credibility***."  With respect to whether the Nikola One prototype was operational, Russell

22  stated, "***[W]e tried to build a prototype that would operate, it had all of the equipment for***

23  ***it to be able to operate, it was capable of operating.  We chose not to operate that truck***

24  

25  [7]    Edward Ludlow, BLOOMBERG, *Nikola Board Member Says Startup Are Too Focused on Past* (Sept. 15, 2020).

26  [8]    SA Transcripts, *Nikola's (NKLA) CEO Mark Russell Presents at Morgan Stanley 8th*
27  *Annual Virtual Laguna Conference (Transcript)*, SEEKING ALPHA (Sept. 16, 2020),
https://seekingalpha.com/article/4374531-nikolas-nkla-ceo-mark-russell-presents-
28  morgan-stanley-8th-annual-virtual-laguna-conference (emphasis added).

1   *because . . . we were pivoting to hydrogen in the middle of that*."

2      112.  On September 22, 2020, Brady delivered remarks at the Evercore ISI Virtual

3 New Mobility & AI Forum, where he again supported the Nikola Rebuttal Report.  Brady

4 stated, "***With respect to the Hindenburg Report, as well as Trevor Milton's resignation,***

5 ***as you know, the company had provided [a] very comprehensive response to the***

6 ***Hindenburg report last Monday, about a week ago***."[9]

7      113.  With respect to Mr. Milton's remarks about the Nikola One prototype in 2016,

8 Brady stated, "I can tell you that for folks that were present at the event clearly understood

9 that the truck was a show truck, and it was not moving under its own propulsion.  I have

10 spoken with one of my largest investors of Nikola, who was present at that event, and he

11 clearly understood that that was a [show] truck.***[10]***  I understand that there may be some

12 different views in terms of what Trevor may have stated.  Anyone who's involved in the

13 automotive world understand[s] when a truck is first introduced, it's a [show] truck . . . We

14 have made it very clear in our response."  Brady stressed that the Nikola One prototype was

15 irrelevant to investors at that time.  Brady explained that what investors "should think about

16 is Nikola Two, which is a fuel-cell truck prototype that we have unveiled at Nikola

17 World."[11]  Brady highlighted the achievements that Nikola had made with respect to the

18 Nikola Two, including that the truck had driven "under [its] own propulsion"; that the

19 Company had "demonstrated many times, including [to] dozens of pipe investors who came

20 to Arizona, a two-seater truck and actually also [a] riding truck"; and that the Nikola Two

21 had delivered beer for Anheuser-Busch.

22      114.  With respect to Nikola's component parts, Brady explained at length that

23 Nikola did not purchase off-the-shelf component parts but instead that Nikola worked with

24 ──────────

25 [9]  SA Transcripts, *Nikola Corporation (NKLA) Presents at Evercore ISI Virtual New Mobility & AI Forum (Transcript)*, SEEKING ALPHA (Sept. 23, 2020), https://seekingalpha.com/article/4375842-nikolas-nkla-presents-evercore-isi-virtual-new-mobility-and-ai-forum-transcript (emphasis added).

27 [10]  *Id.* (emphasis added).

28 [11]  *Id.* (emphasis added).

its partners to design and engineer component parts and that Nikola's partners then "industrialize[d]" the parts, including the eDrive and rear axle, cab, and chassis. Brady also explained that Nikola "co-developed" the fuel cell with Bosch, and that the battery pack was Nikola's "design at the pack level." Brady confirmed that the infotainment system belonged to Nikola and that Nikola was "***responsible for electric propulsion components that represent about 15% in terms of volume, but represent 85% in terms of value***."

115.    Beginning on or about June 6, 2022 and thereafter, Mr. Milton started to learn that, days after the Hindenburg Report was released, in addition to certain of the Individual Defendant's public remarks defending Mr. Milton, one of the Individual Defendants also expressed privately his views that the statements Mr. Milton made were not fraudulent.

### C.    Mr. Milton Voluntarily Resigns.

116.    On September 20, 2020, within days of the Post-Merger Board first approaching Mr. Milton seeking his removal, Mr. Milton surrendered all of his executive and non-executive roles at Nikola and left the Company.

117.    The primary factor underlying Mr. Milton's decision to resign was the declining health of his wife, which the swarm of media attention exacerbated. There also were security threats concerning Mr. Milton and his family. Indeed, as part of Mr. Milton's separation agreement, the Company agreed to pay for a security sweep of Mr. Milton's house.

118.    Mr. Milton believed that he was leaving the Company in safe hands. The last thing Mr. Milton expected was for the Company and the Individual Defendants, including some of his closest friends and mentors, to turn on him; lie about him, his motives, and his character; and—in an effort to save themselves from liability—serve him up to be indicted for fraud and to lose his liberty, assets, and name, all while destroying the Company's credibility and shareholder value for no reason.

### IV.    NIKOLA FEEDS THE GOVERNMENT A FALSE NARRATIVE, AND MR. MILTON IS CHARGED BASED ON THAT NARRATIVE.

### A.    The Government Charges Trevor.

119.    On July 29, 2021, the DOJ unsealed a criminal indictment (the "DOJ

46

Indictment") charging Mr. Milton with securities and wire fraud in connection with his alleged "scheme to defraud and mislead investors" about the Nikola's development of products and technology.[12]  The SEC unsealed a complaint the same day alleging a similar violations of the securities laws (the "SEC Complaint").

120.   In the DOJ Indictment, the SEC Complaint and in a joint SEC/DOJ press conference held on the same day (the "Press Conference"), the DOJ made a number of allegations against Mr. Milton based on materially false and misleading information and omissions that the Individual Defendants and the Company, through the Company's counsel, provided to the Government, including but not limited to the following:

   a.   As to Mr. Milton's intent to mislead, Audrey Strauss, the United States Attorney for the Southern District of New York, stated in a July 29, 2021 press release announcing the indictment that "Trevor brazenly and repeatedly used social media, and appearances and interviews on television, podcasts, and in print, to make false and misleading claims about the status of Nikola's trucks and technology."[13] Ms. Strauss also stated during the joint press conference that "at the bottom this is a very straightforward case.  Milton told lies to generate popular demand for Nikola's stock."[14]  U.S. Postal Inspection Service Inspector-in-Charge Phillip R. Bartlett stated in the same press release that Mr. Milton was a "fraudster[]," "liar[]," "cheater[]," and "thie[f]."[15]  The SEC Complaint similarly alleged that "[Mr.]

---

[12]   *Former Nikola Corporation CEO Trevor Milton Charged in Securities Fraud Scheme*, UNITED STATES ATTORNEY'S OFFICE, SOUTHERN DISTRICT OF NEW YORK (July 29, 2021), DOJ Press Release, https://www.justice.gov/usao-sdny/pr/former-nikola-corporation-ceo-trevor-milton-charged-securities-fraud-scheme  (hereinafter DOJ Press Release).

[13]   DOJ Press Release.

[14]   U.S. Attorney's Office for the Southern District of New York, *Press Conference 07-29-2021* (July 19, 2021), https://www.facebook.com/usaosdny/videos/press-conference-07-29-2021/2990015111270214/ (hereinafter, "Press Conference").

[15]   DOJ Press Release.

Milton used his platform to mislead investors."[16]

b.      As to Mr. Milton's alleged scheme, the DOJ Indictment alleged that "from at least November 2019 up through and including at least in or about September 2020," Mr. Milton "engaged in a scheme to defraud" by making "false and misleading statements regarding Nikola's products and capabilities to induce retail investors to purchase Nikola stock."[17]  Ms. Strauss similarly stated during the Press Conference that "[Mr.] Milton was able to take advantage of the fact that the retail investors who purchased Nikola stock did not have access to all of the information that the strategic institutional investors had."[18]  The SEC Complaint similarly alleged that "[Mr.] Milton embarked on a relentless public relations blitz aimed at a class of investors he called 'Robinhood investors,'" "[t]hrough frequent nationally televised media appearances and a ubiquitous presence on social media . . . "[19]

c.      As to Mr. Milton's motive, the DOJ Indictment alleged that Mr. Milton "was motivated to engage in the fraudulent scheme in order to enrich himself and elevate his stature as an entrepreneur.  Indeed, during the course of the fraud, [Mr. Milton] who aspired to be listed among Forbes's 100 richest people, saw the market value of his interest in Nikola rise substantially."[20]

d.      Regarding the "In Motion" video, the DOJ Indictment alleged "that [Mr. Milton] had Nikola publish on Twitter and also published on his own Twitter account a video in which the Nikola One appeared to be driving on its own power down a road with no incline, when the truck only was rolled down the hill and

---

[16]    SEC Complaint ¶ 3.

[17]    DOJ Indictment ¶¶ 1, 3.

[18]    Press Conference.

[19]    SEC Complaint ¶ 3.

[20]    DOJ Indictment ¶ 4.

1    brought to a stop."[21]

2           e.     Regarding the Nikola Badger, while standing in front of a picture of

3    the Nikola One and a rendering of the Badger pickup truck (not an actual photo of

4    the two working prototypes that existed), Ms. Strauss stated during the press

5    conference that "the Badger was *nothing more* than another company's truck that

6    was dressed up with Nikola branding."[22]  The DOJ Indictment similarly alleged that

7    Trevor misled investors into believing that "Nikola had engineered and built an

8    electric- and hydrogen-powered pickup truck known as 'the Badger' from the

9    'ground up' using Nikola's parts and technology, when [Mr. Milton] knew that was

10   not true."[23]



19          f.     Regarding Nikola's component parts, the DOJ Indictment alleged that

20   Mr. Milton misled investors into believing "[t]hat Nikola had developed batteries

21   and other important components in-house, when [Mr. Milton] knew that Nikola was

22   acquiring those parts from third parties."[24]

23   121.   Each of these allegations by the Government was based on false and

24   misleading information and omissions that the Individual Defendants and the Company,

25   _____

26   [21]   *Id*. at ¶ 2.

27   [22]   Press Conference.

27   [23]   DOJ Indictment ¶ 2.

28   [24]   *Id*.

through the Company's counsel, knowingly provided to the Government.

122.   Upon the news of the DOJ Indictment and SEC Complaint filed against Mr. Milton, Nikola's stock price decreased from approximately $13 per share to approximately $11.90 per share.  Nikola's stock price continued to decline up to and including the date of Mr. Milton's criminal trial.

**B.     The Individual Defendants and the Company Knowingly Provided the Government With False and Misleading Information**.

123.   The above allegations that the Government levied against Mr. Milton were based on a false narrative that the Individual Defendants and the Company, through the Company's counsel, provided to the Government, beginning in November 2020, several weeks after the Hindenburg Report was released.  Beginning on or about June 6, 2022 and thereafter, Mr. Milton started to learn that the Individual Defendants and the Company knew that the narrative was false based on information known by the Individual Defendants and the Company and the statements Nikola employees made to the Company and the Company's counsel in September and October 2020.

124.   Beginning on or about June 6, 2022 and thereafter, Mr. Milton started to learn that, with Mr. Milton out of the picture, the Company and the Individual Defendants were advised that they may face legal liability.  The Company and the Individual Defendants, though the Company's counsel, immediately went into overdrive in a successful attempt to craft a misleading narrative that painted Mr. Milton as a lone wolf, a bad actor, and an intentional wrongdoer, and the other Nikola directors and officers as innocent bystanders.

125.   Eight weeks after the Hindenburg Report came out, on or around November 12, 2020, approximately eight months before the Government charged Mr. Milton, the Company, through Nikola's counsel, Kirkland, prepared a PowerPoint presentation (the "Kirkland Presentation"), which the Company shared with representatives of the SEC and the DOJ.

126.   Upon information and belief, Nikola's counsel regularly kept the Company and the Individual Defendants apprised of the false information and narrative being provided to the Government, and provided the Company and the Individual Defendants

with drafts of presentations or talking points that were to be shared with, and disseminated to, the Government.

127.    The incorrect and misleading conclusion that the Individual Defendants and the Company disseminated to the Government was that Mr. Milton was a bad actor, who, acting as a lone wolf since Nikola's inception and over repeated objections from the officers and directors, made misstatements about every aspect of the Company, and that "Nikola ha[d] resolved its most significant impediments by separating from Milton."[25]   The Company also omitted material information and context regarding certain of Mr. Milton's and the Company's statements that the Government alleged were misleading.

128.    The clear goal of the Kirkland Presentation was to absolve entirely the Company and Individual Defendants, and to shine the spotlight solely and directly on Mr. Milton, scapegoating Mr. Milton.

129.    The Kirkland Presentation contained a misleading version of the facts in multiple respects.  In particular, in a number of circumstances, the Kirkland Presentation simply reported certain statements as "false," giving the misimpression that Mr. Milton intentionally made misstatements, without making any efforts to contextualize Mr. Milton's statements.  Unlike the Company's position in the Nikola Rebuttal Report, which described the Hindenburg Report as containing "false and misleading statements regarding the Company's operations and multi-year, groundbreaking R&D efforts," the Kirkland Presentation misleadingly elevated every statement that the Hindenburg Report alleged was inaccurate, yet was taken completely out of context, to the level of a material misstatement. Many of the incorrect themes and theories that the Company and the Individual Defendants fabricated in the Kirkland Presentation made their way into the DOJ Indictment and the SEC Complaint.

---

[25]    Asheesh Goel and Zachary Brez, *Presentation to: U.S. Department of Justice and U.S. Securities & Exchange Commission Nikola Phase I Investigation Report* at 5, KIRKLAND    &    ELLIS    LLP    (Nov.    12,    2020), https://www.slideshare.net/slideshow/nikola-presentation-to-doj-sec-nov-12-2020/250872402 (hereinafter Kirkland Presentation).

**i.    False and Misleading Information About Mr. Milton's Intent.**

130.    The Government alleged that Mr. Milton was a "fraud," "liar," "cheater," and "thief", who "brazenly and repeatedly used social media, and appearances and interviews on television, podcasts, and in print, to make false and misleading claims about the status of Nikola's trucks and technology."   The element of fraudulent intent, or scienter, is a critical element that the Government must prove in a securities fraud prosecution, whether criminal or civil.   The Government made this allegation in reliance on the materially false and misleading information provided by the Company and the Individual Defendants, through the Company's counsel (and the omission of material information that the Company and the Individual Defendants did not provide).

131.    The Kirkland Presentation, which the Company and the Individual Defendants, though its counsel, presented to the Government in November 2020, did not mention, even once, that Mr. Milton did not intend to mislead investors, and that when Mr. Milton spoke, his intention was to refer to Nikola's business plan and what Nikola was working towards achieving.

132.    The Company and the Individual Defendants knew that the Government's allegation regarding Mr. Milton's fraudulent intent was false.

133.    Beginning on or about June 6, 2022 and thereafter, Mr. Milton started to learn that in late September and October 2020, the Company and Individual Defendants believed, and knew that numerous other Nikola employees believed, that Mr. Milton did not intend to mislead anyone.   The Company was aware that For example:

a.    One employee believed that Mr. Milton was a visionary who spends a lot of his time in the future such that, in some ways, the future becomes the present to him.   She also believed that it was not always clear to her whether Mr. Milton understood that his claims about Nikola technology were untrue.

b.    Another employee stated that he did not believe that Mr. Milton misstated anything but instead that Mr. Milton was optimistic more about future capabilities than what he knew to be factual today.

c.    Another Nikola employee believed that Mr. Milton did not try to mislead anyone, but would become overly excited.

d.    Yet another Nikola employee stated that Mr. Milton was a visionary and that his way of speaking was simply how he communicates in general.  The employee also believed that the primary issue with Mr. Milton's public statements was the verb tense.

e.    Yet another Nikola employee stated that he did not believe Mr. Milton was being intentional about any of the alleged misstatements and also that he did not believe that Mr. Milton was deceitful or manipulative but rather Mr. Milton simply did not understand things and made confusing statements.  The employee also stated that at no point did he feel that Mr. Milton was unethical or intending to defraud and that Mr. Milton did not ever mean to intentionally make any misrepresentations.

f.    Yet another employee believed that he never thought Mr. Milton was trying to affect the stock price.

g.    Another employee, who would end up testifying against Mr. Milton during the criminal trial, initially expressed that he wanted to give Mr. Milton the benefit of the doubt with respect to his statements and that Mr. Milton did not have any malicious intent or desire to defraud.

134.   Beginning on or about June 6, 2022 and thereafter, Mr. Milton also learned that one of the Individual Defendants privately believed that anything Mr. Milton said or did while he was at the Company was not fraud.

135.   Beginning on or about June 6, 2022 and thereafter, Mr. Milton started to learn that several of the Individual Defendants admitted that Mr. Milton genuinely believed the statements that he made to investors, in other words, that Mr. Milton did not intend to defraud any investors.

136.   In or about 2023 and 2024, Mr. Milton had several private conversations with one of the Individual Defendants where the Defendant admitted to Mr. Milton that the Defendant knew that Mr. Milton had been talking about the business plan in 2020 and did

not intend to mislead anyone, and the Defendant insisted that he had testified to that effect at trial. The Defendant also told Mr. Milton that, on or about September or October 2020, he told the Company, through its counsel, that Mr. Milton was referring to the business plan when speaking in the present tense, but that the Company, through its counsel, did not provide that information to the Government.

137. The Company and the Individual Defendants failed to take any steps to correct the Government's false allegations that the Company and the Individual Defendants knew originated with the materially false and misleading information that the Company and the Individual Defendants, through the Company's counsel, provided (and the omission of material information that Company and the Individual Defendants did not provide) to the Government.

### ii.    False and Misleading Information About the Alleged Scheme.

138. The Government alleged that Mr. Milton, and Mr. Milton alone, "engaged in a scheme to defraud investors" by making "false and misleading statements" on nationally televised media appearances, podcast and social media, "regarding Nikola's products and capabilities to induce retail investors to purchase Nikola stock." The Government made this allegation in reliance on the materially false and misleading information provided by the Company and the Individual Defendants, through the Company's counsel (and the omission of material information that the Company and the Individual Defendants did not provide).

139. The Kirkland Presentation, which the Company and the Individual Defendants, though Nikola's counsel, presented to the Government in November 2020, stated that "[s]tatements by Milton to other Nikola executives suggest that Milton used social media to appeal to 'Robinhood investors' and hype Nikola to potential investors."[26]

140. However, the Company and the Individual Defendants knew that this allegation regarding Mr. Milton's alleged scheme to target retail investors in interviews,

---

[26]    *Id.* at 4.

podcast, and on social media was false.  As described above, based on information known to the Company and the Individual Defendants at the time that they, through Nikola's counsel, made the Kirkland Presentation, the Company and the Individual Defendants misleadingly omitted the fact that the Company and the Individual Defendants, including Girsky, Ubben, Brady, and Russell had orchestrated the media strategy to put Mr. Milton front and center, with the express goal of appealing to retail investors in a manner similar to Richard Branson.  Certainly, neither the Company nor the Individual Defendants objected to that media strategy.  Mr. Milton, on his own, did not decide, generate, or execute a media strategy to appeal to retail investors.

141.    The Company and the Individual Defendants, through Nikola's counsel, also represented in the Kirkland Presentation that "[s]enior leadership took steps to limit Mr. Milton's exposure to investors."[27]  However, the Company and the Individual Defendants, including Worthen, Russell, Brady, Ubben, and Girsky knew that this allegation regarding attempts to limit Mr. Milton's exposure to investors, which, when the Company became public included retail investors, was false.  As described above, based on information known to the Company and the Individual Defendants at the time they, through Nikola's counsel, made the Kirkland Presentation, the Company and the Individual Defendants misleadingly omitted the fact that Nikola, consistent with the "Richard Branson" media strategy, continuously scheduled Mr. Milton to appear on nationally televised interviews, with the knowledge and intent that investors undoubtedly would see these interviews. Nikola scheduled Mr. Milton for interviews *up until the day before* the Hindenburg Report was released.  The Individual Defendants, including Worthen, Brady, Russell, Brady, and Girsky, and others at the Company, continuously encouraged Mr. Milton to speak publicly about the Company, telling him what a "great job" he had done in interviews.  At most, Nikola asked Mr. Milton not to speak with institutional investors, a directive which Mr. Milton obeyed.

---

[27]    *Id*.

142. The Individual Defendants and the Company also knew, but omitted any information regarding, the Company's or the Individual Defendants', including Worthen's, Brady's, and Russell's, awareness of potential ambiguities in Mr. Milton's statements, some of which the Government subsequently alleged were inaccurate or misleading. For example, with respect to the statements Mr. Milton made during his interview on the Tesla Charts podcast, the Kirkland Presentation included a screenshot of Fretheim's concerns about Mr. Milton's statements juxtaposed with a quote from Dale Prows, Nikola's Global Head of Infrastructure Development, stating that Mr. Milton's statement was "false."[28] The Kirkland Presentation misleadingly omitted that Nikola's marketing team and Worthen, at Mr. Milton's request, reviewed Mr. Milton's interview *prior* to the interview being released on the podcast, and that numerous people, including Russell, Brady, and Worthen were aware of potential ambiguities and failed to correct any alleged misstatements.

143. Beginning on or about June 6, 2022 and thereafter, Mr. Milton started to learn that not only were the Company and the Individual Defendants aware, in 2020, that certain of Mr. Milton's statements were potentially ambiguous, but also that they failed to notify him, or do anything to attempt to correct or clarify his statements at the time.

144. Moreover, in a section of the Kirkland Presentation titled "Integrity of Current Leadership," the Company and the Individual Defendants self-servingly touted to the Government that "[t]he Company is in the hands of a strong, well-credentialed management team."[29] The slide included references to and pictures of Russell, Brady and Worthen. In reality, the Company and the Individual Defendants knew that Russell, Brady, and Worthen were aware of potential ambiguities in Trevor's statements and failed to do or say anything. The Kirkland Presentation also touted that "[t]he Company is also in the hands of an experienced Board," including both Girsky and Shindler.[30] In reality, the Company and the Individual Defendants knew that Girsky was one of the masterminds behind the Richard

---

[28] *Id.* at 38–39.

[29] *Id.* at 128.

[30] *Id*. at 129.

Branson media strategy.

145.   The Company and the Individual Defendants failed to take any steps to correct the Government's false allegations that the Company and the Individual Defendants knew originated with the materially false and misleading information that the Company and the Individual Defendants, through Nikola's counsel, provided to the Government (and the omission of material information that the Company and the Individual Defendants did not provide) to the Government.

### iii.   False and Misleading Information About Mr. Milton's Motive.

146.   The Government alleged that Mr. Milton "was motivated to engage in the fraudulent scheme in order to enrich himself and elevate his stature as an entrepreneur," including aspiring to be listed on the Forbes 100 list.   The Government made this allegation in reliance on the materially false and misleading information provided by the Company and the Individual Defendants, through Nikola's counsel (and the omission of material information that the Company and the Individual Defendants did not provide).

147.   The Company and the Individual Defendants originated the false theory regarding Mr. Milton's motive with a slide in the Kirkland Presentation entitled "Trevor Milton's Character," which included bullet points such as "manic behavior," "desire to lead a billionaire lifestyle," "trading stock for assets," "focus on stock price," and "preoccupation with social media."[31]   The slide also referred to Mr. Milton's ranking on the Forbes list.[32]

148.   However, the Company and the Individual Defendants knew that this allegation regarding Mr. Milton's alleged motive to commit fraud was false and fabricated by Company counsel, but provided the fabricated theory to the Government anyway.

149.   Beginning on or about June 6, 2022 and thereafter, Mr. Milton started to learn that Kirkland fabricated, and the Company and the Individual Defendants adopted, the theory that Mr. Milton was a manic, not well-adjusted narcissist who wanted a flamboyant lifestyle, to be famous, and was willing to embellish and exaggerate facts to increase the

---

[31]   *Id.* at 126.

[32]   *Id.* at 125.

stock price in the short term.   However, when Kirkland suggested that Mr. Milton committed securities fraud with this motive, one Defendant disagreed with that premise, but that disagreement never made it into the Company's discussions with and submissions to the Government.

150.   Kirkland floated a similar hypothesis to another Defendant, suggesting that Mr. Milton was manic and bipolar and that Mr. Milton wanted to post on social media because he thought he could influence the stock price.   That Defendant also disagreed with Kirkland's hypothesis.

151.   The Company and the Individual Defendants failed to take any steps to correct the Government's false allegations that the Company and the Individual Defendants knew originated with the materially false and misleading information that the Company and the Individual Defendants, through Nikola's counsel, provided (and the omission of material information that the Company and the Individual Defendants did not provide) to the Government.

**iv.**   **False and Misleading Information About the "In Motion" Video.**

152.   The Government alleged "that [Mr. Milton] had Nikola publish on Twitter and also published on his own Twitter account a video in which the Nikola One appeared to be driving on its own power down a road with no incline, when the truck only was rolled down the hill and brought to a stop."   The Government made this allegation in reliance on the materially false and misleading information provided by the Company and the Individual Defendants, through Nikola's counsel (and the omission of material information that the Company and the Individual Defendants did not provide).

153.   The Company and the Individual Defendants, through the Company's counsel, in the Kirkland Presentation represented that the "In Motion" video "is misleading because it leads the viewer to believe the truck is operating under its own power."   The Kirkland Presentation also stated that Mr. Milton "really wanted to show the truck in motion" and that Mr. Milton "made the decision to show the truck in motion" because Mr. Milton "drove all of the decisions at the time."

154.   The Company and the Individual Defendants knew, based on information available to them, that the Government's allegation regarding the origin, approval, and posting of the "In Motion" video was false and misleading.  With respect to the "In Motion" video, the Company and the Individual Defendants excluded the multiple employee accounts that Worthen, not Mr. Milton, was the person who suggested and approved the language "in motion" to describe the truck in the video.  Indeed, the Board of Directors at the time was aware of the "In Motion" video.  The draft meeting minutes of Nikola Motor's October 2017 Board meeting, which Worthen drafted and circulated to the Board of Directors at the time, including Mr. Milton, Brady, and Thompson, provided under the "Marketing" section: "Phillips commercial – truck moving, ***but not under our power***."

155.   Beginning on or about June 6, 2022 and thereafter, Mr. Milton started to learn that, in late September and early October 2020, the Company and the Individual Defendants knew that multiple Nikola employees recalled with respect to the "In Motion" video that Worthen himself came up with, and approved of, using the phrase "in motion" to describe the Nikola One prototype in the Phillips commercial.  For example, a Nikola employee, CW-1, told the Company, through the Company's counsel, that he knew that Worthen crafted the phrasing and was okay with the Company using 'in motion.'"  Another Nikola employee, CW-2, told the Company, through the Company's counsel, that during one of the Company's "stand-up" meetings, he recalled that someone asked about the "In Motion" video and if it was going to be posted to Nikola's social media channels.  Worthen said that the Company was working on figuring out what to do with the video and how it would be phrased.

156.   In 2024, another former Nikola employee told Mr. Milton that Worthen directed the posting of the "In Motion" video, not Mr. Milton.  That former employee's statement further corroborated the other employee accounts that Worthen drafted the language "In Motion."

157.   The Company and the Individual Defendants failed to take any steps to correct the Government's false allegation that the Company and the Individual Defendants

knew originated with the materially false and misleading information that the Company and the Individual Defendants, through Nikola's counsel, provided (and the omission of material information that the Company and the Individual Defendants did not provide) to the Government.

v.      **False and Misleading Information About Nikola's Component Parts.**

158.    The Government alleged that Mr. Milton misled investors into believing that Nikola had developed batteries and other important components in-house, when Mr. Milton knew that Nikola was acquiring those parts from third parties. The Government made this allegation in reliance on the materially false and misleading information provided by the Company and the Individual Defendants, through Nikola's counsel (and the omission of material information that the Defendants did not provide) to the Government.

159.    The Company and the Individual Defendants knew, based on documents and information available to them, that this allegation regarding that Nikola "did" component parts "in house" was false. The Company and the Individual Defendants knew that Nikola as a private company worked with partners and outside component parts manufacturers to develop, design, and produce bespoke component parts that Nikola integrated, or planned to integrate, into its semi-trucks.

160.    For example, regarding Nikola's software and vehicle controls, Nikola outsourced the vehicle controls but was developing the code and chip architecture for the infotainment, over-the-air updating, and electric control units, including the vehicle control module and battery control module.

161.    For the Nikola truck e-axle and gears, Nikola and Fiat Powertrain developed a bespoke e-axle to Nikola's specifications and Nikola co-owned the intellectual property arising from the development agreement.

162.    With respect to Nikola's battery pack, Nikola had multiple programs that were conducted in parallel—as many OEM's did at the time. Some battery packs were designed by Nikola employees with the assistance of outside engineering groups. Some battery programs were acquisition targets of the Company to bring those targets' intellectual

property inside Nikola.  Although Nikola did not make the battery cells themselves, Nikola worked with a number of battery cell manufacturers such as Samsung and LG to deliver cells that would fit within the Nikola-designed battery packs, which is industry practice. Outside groups like Ricardo plc, Bosch, and AVL List GmbH were individually contracted to help develop the battery pack.  Nikola either solely or jointly owned all of the intellectual property arising from these development agreements, thus contextualizing Mr. Milton's statements.

163.   The Company and the Individual Defendants knew that Nikola worked with MAHLE GmbH to develop the thermal and cooling systems.

164.   The Company and the Individual Defendants knew that Nikola initially worked with ITK Engineering GmbH to develop its inverter and that Nikola owned the intellectual property arising from the development agreement.

165.   Beginning on or about June 6, 2022 and thereafter, Mr. Milton started to learn that, in late September and early October 2020, the Company and the Individual Defendants knew that a number of Nikola employees did not believe that there was nothing inaccurate about Mr. Milton stating that Nikola developed its component parts "in house" because Nikola developed bespoke component parts with partners and because Nikola generally owned the intellectual property.  For example,

a.   One employee agreed that he also would refer to a battery as Nikola's battery in these circumstances where Nikola partnered with another company to develop and manufacture the battery.

b.   Another employee believed that the issue of whether Nikola "does" its component parts in house is not straightforward and that a tweet from Mr. Milton's statement regarding Nikola making batteries "in house" was accurate.

c.   Another employee believed that anyone who has technical expertise would think that "we do" means specifying the requirements and that the innovation Mr. Milton was being asked about rests in the specifications.

d.   Yet another employee stated that he did not think that Mr. Milton's

1    statement that all components were made in house was inaccurate and that Mr.

2    Milton's tweet regarding Nikola's "game changing battery technology" was

3    accurate.

4    166.    During the Kirkland Presentation, the Company and the Individual

5    Defendants, through the Company's counsel, excluded the numerous statements of Nikola

6    employees who did not believe Mr. Milton's statements to be false, inaccurate, or

7    misleading.  Instead, the Kirkland Presentation selectively presented out-of-context quotes

8    from other Nikola employees, including a statement by Brady that "Nikola aspires to build

9    components in-house but does not do so at present."   Specifically regarding Nikola's

10   batteries, the Kirkland Presentation excluded statements from employees such as the

11   statement from a Nikola battery engineer who did not think that Mr. Milton's statement that

12   all components were made in house was inaccurate and also believed that Mr. Milton's

13   tweet about "game changing" battery technology was accurate.  Instead, the Kirkland

14   Presentation included only those statements that *agreed* with the concocted storyline that

15   Nikola did not develop batteries "in house."  The Kirkland Presentation again quoted Brady

16   as stating, "Nikola does not make its own battery in-house," yet ignored the statements

17   Brady to analysts in September 2020 that Nikola did design its battery packs.

18   167.    The Company and the Individual Defendants failed to take any steps to

19   correct the Government's false allegation that the Company and the Individual Defendants

20   knew originated with the materially false and misleading information that the Company and

21   the Individual Defendants, through Nikola's counsel, provided (and the omission  of

22   material information that the Company and the Individual Defendants did not provide) to

23   the Government.

24          **vi.     False and Misleading Information About the Badger.**

25   168.    The Government alleged that the Badger pickup truck was *nothing more* than

26   another company's truck that was dressed up with Nikola branding and that Mr. Milton

27   stated that Nikola was building the Badger from the "ground up" using Nikola's parts and

28   technology when Mr. Milton knew that was not true. The Government made these

1    allegations in reliance on the materially false and misleading information provided by the

2    Company and the Individual Defendants, through Nikola's counsel (and the omission of

3    material information that the Company and the Individual Defendants did not provide).

4         169.   Beginning on or about June 6, 2022 and thereafter, Mr. Milton started to learn

5    that the Company and the Individual Defendants misled the Government into believing that

6    the Badger prototypes were simply Ford F150s with different branding and without any of

7    Nikola's technology or bespoke component parts.   The Company and the Individual

8    Defendants knew, based on documents and information available to it, that this information

9    was false and misleading.

10        170.   The Company and the Individual Defendants knew that Nikola announced

11   that a working Badger prototype would be unveiled at Nikola World in December 2020.

12   Nikola spent $15 million on two working prototypes.   Nikola contracted a group in Italy,

13   Italdesign, to help design and engineer the Badger's exterior and interior parts.   Many of

14   the body parts of the Badger prototypes were built by Italdesign in Italy, to Nikola's

15   specifications, and then shipped to Detroit for assembly.   Consistent with the December

16   2020 completion projection, the Badger prototypes were being assembled in the summer of

17   2020 and ultimately were delivered on or around October 2020, ahead of the timeline Mr.

18   Milton promised.

19        171.   The Company and the Individual Defendants knew that, although the Badger

20   prototypes used certain parts from donor vehicles, a majority of the parts were Nikola-

21   designed.   For example, the prototypes were assembled using an eAxel, suspension system,

22   battery housing frame, exterior panels, front panels, front hood, rear bed, and skateboard,

23   all of Nikola's design.   The interior of the Badger prototypes was Nikola's design.   The

24   infotainment system was Nikola's design to which Nikola owned the intellectual property.

25   In other words, almost all of the Badger was Nikola's intellectual property or design.

26        172.   The Company and the Individual Defendants failed to take any steps to

27   correct the Government's false allegations that the Defendants knew originated with the

28   materially false and misleading information that the Company and the Individual

Defendants, through Nikola's counsel, provided (and the omission of material information that the Company and the Individual Defendants did not provide) to the Government.

**C.    Nikola Intended for the Government To Use the Information Publicly To Charge Mr. Milton.**

173.    Beginning on or about June 6, 2022 and thereafter, Mr. Milton started to learn that the Company and the Individual Defendants clearly intended for the false and misleading information that the Company and the Individual Defendants presented to the Government to become public.  The Company and the Individual Defendants, including Worthen, believed that they would need to push a particular narrative to help the Company and themselves.

174.    Beginning on or about June 6, 2022 and thereafter, Mr. Milton started to learn that, as early as late September and early October 2020, the Company and the Individual Defendants already were seeking an early settlement with the SEC and believed that such settlement only would occur if the Company completely capitulated.

175.    Furthermore, in or around September 2021, the Company and the Individual Defendants, through Nikola's counsel, made a presentation to the SEC about why the SEC should not charge Nikola.  During this presentation, the Company and the Individual Defendants, through Nikola's counsel, bragged and touted that its cooperation with the SEC, which enabled the SEC to reach a charging decision with respect to Mr. Milton just over a year after opening its investigation, had been exemplary and that the Company's internal investigation identified the great majority of the misconduct that ultimately formed the basis for the SEC's charges against Mr. Milton.

176.    The Company and the Individual Defendants, through Nikola's counsel, presented to the SEC a narrow, one-sided, and skewed version of reality, representing that its internal investigation revealed two things: that from 2016 to September 2020, Mr. Milton made certain exaggerated, inaccurate, or misleading statements regarding Nikola's business and operations, and that the Company and the Individual Defendants and others made escalating efforts to address Mr. Milton's tendency to exaggerate and overstate facts.  These representations were false.

177.    The Company and the Individual Defendants, through Nikola's counsel, also represented that it fully disclosed what it learned and did not conceal or minimize any misconduct.  Despite that representation to the contrary, the Company and the Individual Defendants minimized their own wrongful conduct—all of whom were sophisticated and seasoned executives with public company experience—by failing to act when presented with potential ambiguities in Mr. Milton's statements and by greatly exaggerating Mr. Milton's culpability and mental state.  Indeed, the Company and the Individual Defendants failed to disclose fully what they knew about the events surrounding Mr. Milton's alleged misstatements.

**D.      Nikola Failed To Correct the False and Misleading Information**.

178.    The Company and the Individual Defendants sat idly by and made no attempt to correct or clarify the incorrect and misleading allegations that the Government asserted against Mr. Milton, even while knowing that the incorrect and misleading allegations had originated with the Company and its representatives.

179.    As a result, Nikola's stock price declined upon the news of the DOJ Indictment and SEC Complaint, and continued to decline up to and including the date of Mr. Milton's criminal trial.

180.    Mr. Milton has sold Nikola stock at an artificially depressed price do to the Defendants' actions described herein.

**V.       NIKOLA SETTLES WITH THE SEC FOR $125 MILLION**.

181.    On December 21, 2021, Nikola settled charges with the SEC that "before Nikola had produced a single commercial product, [Mr.] Milton embarked on a public relations campaign aimed at inflating and maintaining Nikola's stock price.  [Mr.] Milton's statements in tweets and media appearances falsely gave investors the impression that Nikola had reached certain product and technological milestones."[33]    This purported

---

[33]    *Nikola Corporation to Pay $125 Million to Resolve Fraud Charges*, U.S. SECURITIES AND EXCHANGE COMMISSION (DEC. 21, 2021), https://www.sec.gov/news/press-release/2021-267.

intention by Mr. Milton was the same fictitious motive that the Company and the Individual Defendants had concocted and provided to the Government over a year earlier.

182.    In a statement on the day the settlement was announced, Nikola stated that it was "pleased to bring this chapter to a close as the company has now resolved all government investigations, and that "[t]he company has taken action to seek reimbursement from its founder, Trevor Milton, for costs and damages in connection with the government and regulatory investigations,"[34] implying that allegations in the SEC's order solely were related to Mr. Milton, and that Mr. Milton alone was responsible for the penalties the SEC imposed.   This statement also was false, because the Individual Defendants and the Company had not resolved all Government investigations and still was under investigation by the DOJ—meaning that the Company and the Individual Defendants still faced potential criminal liability.

183.    Beginning on or about June 6, 2022 and thereafter, Mr. Milton started to learn that certain of the Defendants admitted that they did not know the basis for how the SEC arrived at the $125 million settlement, did not agree with the settlement amount, felt strong-armed by the SEC to settle for $125 million, did not agree with some of the SEC statements, and were motivated to settle so that the Company could move on.   The Individual Defendants were motivated to settlement to avoid personal liability.

## VI.    MR. MILTON IS CRIMINALLY TRIED BASED ON THE DEFENDANTS' MISREPRESENTATIONS TO THE GOVERNMENT.

184.    Mr. Milton's criminal trial for securities fraud and wire fraud began on September 12, 2022 in the Southern District of New York.   At the conclusion of the trial, on October 14, 2022, the jury convicted Mr. Milton of two counts of securities fraud and one count of wire fraud.

185.    At trial, the DOJ fully adopted the Individual Defendants' and the Company's fabricated   theory   as   to   Mr.   Milton's   alleged   motive   to   intentionally   make

---

[34]    Scooter Doll, *Nikola to pay $125 million in settlement agreement with SEC*, ELECTREK (Dec. 21, 2021), https://electrek.co/2021/12/21/nikola-to-pay-125-million-in-settlement-agreement-with-sec/.

misrepresentations to investors, stating during its opening remarks that Mr. Milton "repeatedly lied to investors about his company and he made a billion dollars by doing so . . . . He lied to dupe innocent investors into buying his company's stock, so the stock price would go up, all so he could profit big time.  And in that way at least, the defendant was successful because, on the backs of those innocent investors taken in by his lies, he became a billionaire virtually overnight.  That's who Trevor Milton is."  The DOJ also stated that "[Mr.] Milton was committing securities fraud and wire fraud in order to pump his company's stock so that he'd get rich" and that Mr. Milton "targeted ordinary investors".

186.   In summation, the DOJ referred specifically to Brady's testimony—in which Brady stated that "the defendant wanted to be in the Forbes Top 100 list of richest people"—and described that desire as "an astounding level of greed—and to get there, he needed to pump the stock to keep it sky high, completely out of line with reality."

187.   The DOJ also adopted the Individual Defendants' and the Company's fabricated theory that Mr. Milton, on his own, thought to "target" retail investors, instead of the reality that there was a company-driven effort to put Mr. Milton front and center, like Richard Branson, to promote Nikola.  For example, during opening statements, the DOJ stated that Mr. Milton "went to the places where all of us ordinary investors were listening and he lied directly to them.  He targeted them.  He went on Twitter.  He said tons of things that weren't true on Twitter.  He booked himself on mainstream television and podcast appearances.  And then he flooded the airwaves with false and misleading things on those interviews and podcasts.  He told lies to get investors to part with their money, to buy his company's stock."

188.   Furthermore, the evidence that the Individual Defendants and the Company provided to the DOJ and that the DOJ relied upon to allege that Mr. Milton acted with scienter, a *necessary element* of securities fraud, was demonstrably false, and the Individual Defendants and the Company knew it.  For example:

a.   The DOJ argued to the jury the Company's false narrative that other executives at the Company, including Russell, Brady, and Worthen "tried and failed

to control [Mr. Milton].  The executives at Milton's company who worked for him went to him and told him what he was doing was wrong."  Indeed, the Government used these alleged repeated warnings as evidence of scienter, telling the jury "***one other reason, the last reason you know what he did was intentional is that he lied, despite warnings from all the other executives***," and "***this fraud, it was brazen.  He completed it despite warnings from his CFO and his CEO, despite the red light they gave him.  He ignored that***."

b.      The DOJ also argued that "***[a]nother reason you know [Mr. Milton] acted intentionally is that he lied when confronted***.  Like the [Bloomberg] article when confronted about the Nikola One, he could have come clean, he could have said it didn't work back then but we have made progress.  ***He had a choice, but he lied***."  Completely absent from this account is that Worthen represented at the time of the article, in June 2020, that he and the Company stood behind everything Mr. Milton had said.

c.      Neither the Company nor anyone who testified at Mr. Milton's criminal trial corroborated Mr. Milton's belief that, especially with respect to hydrogen, he always was talking about Nikola's business model, although he, at times, used the wrong tense when speaking.  Therefore, the DOJ was able to argue that Mr. Milton was lying when he stated he was speaking about Nikola's business plan.  For example, in summation, the DOJ stated, "***[W]hat about this argument, that this is all about a business model?  There is no reference to a model here. This isn't a statement about the future.***"

189.    To the contrary, the Individual Defendants and the Company knew that Mr. Milton was talking about the business plan, especially with respect to his statements regarding Nikola's hydrogen production plans, and that Mr. Milton often unintentionally spoke in the present tense.

190.    Indeed, in 2023 and 2024, one of the Individual Defendants approached Mr. Milton on at least three occasions and told Mr. Milton that he (one of the Individuals

Defendants) clearly told the Company during its internal investigation in September and October 2020 that Mr. Milton was referring to the business model and that Mr. Milton did not intend to defraud anyone, but neither he nor the Company provided that information to the Government.

191. Beginning on or about June 6, 2022 and thereafter, Mr. Milton started to learn that the Individual Defendants and Nikola employees who testified against him at trial told the Company in or around September and October 2020 that they did not believe Mr. Milton intended to mislead any investors.

192. The DOJ also suggested that Nikola, as a company and from its inception, "was all smoke and mirrors" and that "the founder and CEO of the company built his company on a lie." Indeed, when Mr. Milton was sentenced to four years in prison on December 18, 2023, the presiding Judge did not even recognize that Nikola currently has real, working prototype hydrogen semi-trucks on the road, asking, "[A]re there any actual Nikola trucks on the road?"

193. Despite knowing the truth, the Individual Defendants and the Company sat idly by and made no attempt to correct or clarify the incorrect information that the DOJ publicized at Mr. Milton's trial, even while knowing that the incorrect information had originated with the Company or its representatives.

194. As a result of the Individual Defendants' and the Company's silence, Nikola's stock price continued to decline. On the date that Mr. Milton's trial began, September 12, 2022, Nikola's stock was trading at approximately $5.17 per share. The price of Nikola's stock steadily declined over the course of the trial. By the time Mr. Milton was convicted on October 14, 2023, Nikola's stock price had declined to approximately $3.06 per share.

195. Since October 14, 2022, the price of Nikola's stock has continued to decline. Today, Nikola's stock is trading at approximately $0.50 per share and risks being delisted by the Nasdaq stock exchange.

196. Mr. Milton has sold Nikola stock at an artificially depressed price, due to the Defendants' actions described herein.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT I
## Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Against All Defendants)

197.   Mr. Milton repeats and realleges each and every allegation in paragraphs 1–196 as though fully set forth herein.

198.   Defendants, individually and in concert, directly and indirectly, knowingly and recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they:

        a.   Employed devices, schemes, and artifices to defraud;

        b.   Made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or

        c.   Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Mr. Milton in connection with his transactions in Nikola securities.

199.   Defendants, through Nikola's counsel, provided materially false and misleading statements to the Government and omitted to state material facts to make the statements made, in light of the circumstances under which they were made, not misleading.

200.   Specifically, beginning in or around November 2020, Defendants, through Nikola's counsel, cooperated with the Government's investigation of Nikola and Mr. Milton and provided materially false and misleading information to the Government.  Defendants, through Nikola's counsel, omitted material facts from the information that they, through Nikola's counsel, provided to the Government.

201.   In or around July 2021, the Government, in reliance on the materially false and misleading information provided by Defendants, through Nikola's counsel, made statements which were based on or otherwise relied on the materially false and misleading information that Defendants, through Nikola's counsel, provided to the Government. Starting on or about June 6, 2022, Mr. Milton started to learn that the Government's incorrect statements relied on the materially false and misleading information provided to

the Government by Defendants, through Nikola's counsel.

202.   Defendants took no steps to correct the Government's misstatements that Defendants knew originated with the materially false and misleading information that Defendants, through Nikola's counsel, provided to the Government.

203.   For example, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by:

a.   Providing, through Nikola's counsel, materially false and misleading information to the Government that Mr. Milton intended to mislead investors about the status of Nikola's productions and technology.   In reality, Defendants themselves, and many other employees at Nikola, did not believe that Mr. Milton intended to commit fraud or mislead anyone and therefore lacked scienter, which is an essential element of the securities fraud with which Mr. Milton and Nikola were charged.   Defendants' self-serving and materially false and misleading disclosures to the Government resulted in civil and criminal charges against Mr. Milton, but no such charges against any of the Defendants;

b.   Providing, through Nikola's counsel, materially false and misleading information to the Government about a fictitious scheme, namely, that Mr. Milton covertly, and without Nikola having any knowledge that he was speaking publicly, engaged in a media campaign to target retail investors to enrich himself.   In its public statements, the Government repeated the false and misleading information provided to it by the Defendants when the Government stated that "Milton was using lies to drive demand among retail investors for Nikola's stock" while "the value of Milton's personal stock holdings grew and grew."   Defendants, through Nikola's counsel, also provided the Government with a materially misleading and false narrative that Defendants had done everything they could to stop Mr. Milton from making potentially confusing or ambiguous public statements.   In reality, starting on or about June 6, 2022, Mr. Milton started to learn that Defendants failed to take any action at all to investigate reports from employees that Mr. Milton's statements may have been

confusing or ambiguous.   Defendants' self-serving and materially false and misleading narratives to the Government resulted in civil and criminal charges against Mr. Milton, but no such charges against any of the Defendants;

      c.    Providing, through Nikola's counsel, materially false and misleading information to the Government about a fictitious motive behind Mr. Milton's alleged scheme, namely, that Mr. Milton was motivated to engage in an allegedly fraudulent scheme in order to enrich himself and elevate his stature as an entrepreneur.   In reality, Nikola's counsel concocted this theory, and Nikola and Defendants adopted it.   In its public statements, the Government repeated the materially false and misleading information provided to it by the Defendants, through Nikola's counsel;

      d.    Providing, through Nikola's counsel, materially false and misleading information to the Government about Nikola's Badger pickup trucks, namely, that the prototypes for the Badger were no more than another company's trucks that were dressed up with Nikola branding.   In reality, Defendants knew that this information was materially false and misleading.   In its public statements, the Government repeated the materially false and misleading information provided to it by the Defendants, through Nikola's counsel;

      e.    Providing, through Nikola's counsel, materially false and misleading information to the Government regarding Mr. Milton's allegedly fraudulent posting of a video of an early Nikola One semi-truck prototype that appeared to be driving under its own power and stating that the truck was "in motion."   In reality, Defendants knew that Worthen approved posting the video, drafted the language that the truck was "in motion," and counseled that posting the video and the "in motion" language was legally permissible.   In its public statements, the Government repeated the materially false and misleading information provided to it by the Defendants, through Nikola's counsel;

      f.    Representing, through Nikola's counsel, to the Government that between November 2019 and September 2020, Nikola had not successfully

1  developed a number of semi-truck component parts internally, including Nikola's
2  batteries.  In reality, Defendants knew that a number of Nikola's component parts
3  were designed by Nikola and manufactured to Nikola's specifications by third parties
4  using intellectual property that Nikola owned.  Defendants also knew that numerous
5  Nikola employees believed that Mr. Milton correctly stated that certain component
6  parts were being developed "in house" by Nikola.  In its public statements, the
7  Government repeated the materially false and misleading information provided to it
8  by the Defendants, through Nikola's counsel.

9       204.   When the Government made its materially false and misleading public
10  statements based on the materially false and misleading information provided by
11  Defendants, through Nikola's counsel, Defendants utterly failed to take any action to correct
12  the Government's materially false and misleading statements, even though Defendants were
13  aware of the Government's materially false and misleading statements and even though
14  Defendants knew that the Government's materially false and misleading  statements were
15  based on the materially false and misleading information that Defendants, through Nikola's
16  counsel, provided to the Government.

17       205.   As alleged herein, Defendants, individually and in concert, directly and
18  indirectly, knowingly and recklessly engaged and participated in a fraudulent scheme and
19  fraudulent course of conduct to provide materially false and misleading information to the
20  Government, which the Government then repeated in public statements and which the
21  Defendants failed to correct, in order to avoid personal civil and criminal liability.

22       206.   Defendants acted with scienter in that they knew or were reckless in not
23  knowing that the information they provided to the Government was materially false and
24  misleading and that the Defendants omitted material information necessary to make the
25  information Defendants, through Nikola's counsel, provided to the Government, in the light
26  of the circumstances under which the information was provided, not misleading; knew or
27  were reckless in not knowing that such statements would be issued or disseminated to the
28  investing public; and knowingly or recklessly substantially participated, or acquiesced in

1  the issuance or dissemination of such statements as primary violations of the securities laws.

2  207.   Defendants participated in the fraudulent scheme alleged herein by virtue of

3  their participation in the disclosure, through Nikola's counsel, to the Government of

4  information that was materially false and misleading.

5  208.   Defendants, who are or were senior officers and/or directors of Nikola, had

6  actual knowledge of the material omissions and/or the falsity of the material misstatements

7  set forth above, and intended to deceive, or, in the alternative, acted with reckless disregard

8  for the truth when they omitted to disclose material facts from the information they, through

9  Nikola's counsel, provided to the Government, and which the Government published to the

10  investing public.

11  209.   Defendants' fraudulent acts occurred in connection with the purchase or sale

12  of securities.

13  210.   As a result of the foregoing, the market price of Nikola's securities fell

14  precipitously.  As a Nikola shareholder, Mr. Milton relied on the statements described above

15  and/or relied on the integrity of the market price of Nikola securities in selling Nikola

16  securities at prices that were artificially depressed as a result of Defendants' false and

17  misleading statements and omissions.

18  211.   As a direct and proximate result of Defendants' material misstatements and

19  omissions, fraudulent scheme, and fraudulent course of conduct, Mr. Milton has suffered

20  damages in connection with the sale of securities in an amount to be established at trial.

21  The economic loss suffered by Mr. Milton was a direct result of Defendants' wrongful

22  conduct.  At all relevant times, Mr. Milton has owned shares of Nikola stock.

23  212.   After the Defendants, through Nikola's counsel, provided materially false and

24  misleading information to the Government, which the Government repeated in its public

25  statements, Nikola's share price declined and has never recovered.  As a result of

26  Defendants' misconduct, Mr. Milton sold shares at a price less than the price he would have

27  obtained but for Defendants' wrongful conduct.

28  213.   By reason of the foregoing, Defendants are liable to Mr. Milton for the

substantial damages he suffered, as complained of herein.

**COUNT II**
**Control Person Liability Under Section 20(a) of the Exchange Act**
**(Individual Defendants)**

214.   Mr. Milton repeats and realleges each and every allegation in paragraphs 1–196 as though fully set forth herein.

215.   Individual Defendants participated in the operation and management of Nikola, and conducted and participated, directly and indirectly, in the conduct of Nikola's business affairs.   Because of their senior positions, Individual Defendants knew that the information Individual Defendants, through Nikola's counsel, provided to the Government was materially false or misleading.

216.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the content of information which Individual Defendants, through Nikola's counsel, disclosed to the Government concerning Mr. Milton and Nikola's operations and which Individual Defendants, through Nikola's counsel, withheld from the Government, the investing public, and Mr. Milton.

217.   Individual Defendants exercised their power and authority to cause the wrongful acts complained of herein.   Individual Defendants, therefore, were "controlling persons" of Nikola within the meaning of Section 20(a) of the Exchange Act.   In this capacity, Individual Defendants participated in the unlawful conduct alleged herein which artificially depressed the market price of Nikola securities.   By virtue of their positions as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

218.   As a direct and proximate cause of Individual Defendants' wrongful conduct alleged herein, Mr. Milton suffered damages in connection with transactions in Nikola securities in an amount to be established at trial.

219.   By reason of the foregoing, Individual Defendants are liable to Mr. Milton for the substantial damages he suffered, as complained of herein.

**COUNT III**
**Direct Action for Breach of Fiduciary Duties of Care, Loyalty, and Good Faith**
**(Against Individual Defendants)**

220.    Mr. Milton repeats and re-alleges each and every allegation in paragraphs 1–196 as though fully set forth herein.

221.    As Nikola's directors and officers, Individual Defendants owed Nikola and its shareholders, including Mr. Milton, the utmost fiduciary duties of care, loyalty, and good faith.

222.    These duties required Individual Defendants to place the interests of Nikola's shareholders above Individual Defendants' personal interests.

223.    Individual Defendants, collectively and individually, consciously violated and breached their fiduciary duties of care, loyalty, and good faith by prioritizing their own personal, financial, and reputational interests above the interests of Nikola shareholders. Individual Defendants did this by engaging in a scheme to provide, through Nikola's counsel, false and misleading information to the Government about Mr. Milton and Nikola so that the Individual Defendants could avoid personal civil and criminal liability.

224.    As a direct or proximate result of Individual Defendants' breaches of their fiduciary duties to Nikola and its shareholders, including Mr. Milton, Mr. Milton has sustained significant damages and will continue to sustain damages, for which Individual Defendants are liable to Mr. Milton.  Such damages include, among other things, payment of fines, costs associated with defending securities class action lawsuits, government investigations, and subpoenas, and severe damage to the value of Mr. Milton's shares of Nikola stock.

**COUNT IV**
**Direct Action for Breach of Fiduciary Duty**
**(Against Individual Defendants)**

225.    Mr. Milton repeats and realleges each and every allegation in paragraphs 1–196 as though fully set forth herein.

226.    Individual Defendants had a fiduciary duty to ensure that shareholders and investors received accurate, truthful, and complete information.

227.    Individual Defendants violated this fiduciary duty.

228.    Specifically, in or around November 2020, Individual Defendants, through Nikola's counsel, cooperated with the Government's investigations and provided false and misleading information to the Government and otherwise omitted to disclose to the Government material information necessary to make the information Individual Defendants, through Nikola's counsel, provided to the Government, in the light of the circumstances under which the information was provided, not misleading.

229.    In or around July 2021, the Government made materially false and misleading public statements which were based on or otherwise relied on the materially misleading and incomplete information that Individual Defendants, through Nikola's counsel, provided to the Government.   Individual Defendants took no steps to correct the Government's misstatements that Individual Defendants knew originated with the materially false and misleading information that Individual Defendants, through Nikola's counsel, provided to the Government.

230.    For example, Individual Defendants breached their fiduciary duties by:

a.    Providing, through Nikola's counsel, to the Government materially false and misleading information that Mr. Milton intended to mislead investors about the status of Nikola's products and technology.   In reality, Individual Defendants themselves, and many other employees at Nikola, did not believe that Mr. Milton intended to commit fraud or mislead anyone and therefore lacked scienter, which is an essential element of the securities fraud with which Mr. Milton and Nikola were charged.   Individual Defendants' self-serving and materially false and misleading disclosures to the Government resulted in civil and criminal charges against Mr. Milton, but no such charges against any of the Individual Defendants;

b.    Providing, through Nikola's counsel, to the Government materially false and misleading information about a fictitious scheme, namely, that Mr. Milton covertly, and without Nikola having any knowledge that he was speaking publicly, engaged in a media campaign to target retail investors to enrich himself.   In its public

statements, the Government repeated the materially false and misleading information provided to it by the Individual Defendants, through Nikola's counsel, when the Government stated that "Milton was using lies to drive demand among retail investors for Nikola's stock" while "the value of Milton's personal stock holdings grew and grew." Individual Defendants, through Nikola's counsel, also provided the Government with a materially false and misleading narrative that Individual Defendants had done everything they could to stop Mr. Milton from making potentially confusing or ambiguous public statements. In reality, starting on or about June 6, 2022, Mr. Milton started to learn that Individual Defendants failed to take any action at all to investigate reports from employees that Mr. Milton's statements may have been confusing or ambiguous. Individual Defendants' self-serving and materially false and misleading narrative to the Government resulted in civil and criminal charges against Mr. Milton, but no such charges against any of the Individual Defendants;

c.      Providing, through Nikola's counsel, to the Government materially false and misleading information about a fictitious motive behind Mr. Milton's alleged scheme, namely, that Mr. Milton was motivated to engage in the allegedly fraudulent scheme in order to enrich himself and elevate his stature as an entrepreneur. In reality, Nikola's counsel concocted this theory, and Nikola and Individual Defendants adopted it. In its public statements, the Government repeated the materially false and misleading information provided to it by the Individual Defendants, through Nikola's counsel;

d.      Providing, through Nikola's counsel, to the Government materially false and misleading information about Nikola's Badger pickup trucks, namely, that the prototypes for the Badger were no more than another company's trucks that were dressed up with Nikola branding. In reality, Individual Defendants knew that this information was materially false and misleading. In its public statements, the Government repeated the materially false and misleading information provided to it

by the Individual Defendants, through Nikola's counsel;

e.     Providing, through Nikola's counsel, to the Government materially false and misleading information regarding Mr. Milton's allegedly fraudulent posting of a video of an early Nikola One semi-truck prototype that appeared to be driving under its own power and stating that the truck was "in motion." In reality, Individual Defendants knew that Worthen approved posting the video, drafted the language that the truck was "in motion," and counseled that posting the video and the "in motion" language was legally permissible. In its public statements, the Government repeated the materially false and misleading information provided to it by the Individual Defendants, through Nikola's counsel;

f.     Representing, through Nikola's counsel, to the Government that between November 2019 and September 2020, Nikola had not successfully developed a number of semi-truck component parts internally, including Nikola's batteries. In reality, Individual Defendants knew that a number of Nikola's component parts were designed by Nikola and manufactured to Nikola's specifications by third parties using intellectual property that Nikola owned. Individual Defendants also knew that numerous Nikola employees believed that Mr. Milton correctly stated that certain component parts were being developed "in house" by Nikola. In its public statements, the Government repeated the materially false and misleading information provided to it by the Individual Defendants, through Nikola's counsel.

231.  When the Government made materially false and misleading public statements based on the materially false and misleading information provided by Individual Defendants (through Nikola's counsel), Individual Defendants breached their fiduciary duties by failing to take any action to correct the Government's materially false and misleading statements, even though Individual Defendants were aware of the Government's materially false and misleading public statements and even though Individual Defendants knew that the materially false and misleading information had originated with Individual

1    Defendants, through Nikola's counsel, and Nikola's representatives.

2         232.    The Individual Defendants also breached their fiduciary duties to provide
3    truthful information to the investing public though Section 5250(b)(1) and IM-5250-1 of
4    Nasdaq's General Procedures and Prerequisites for Initial and Continued Listing on the
5    Nasdaq Stock Market, which the Individual Defendants violated.   As a publicly traded
6    company, Nikola is subject to extensive regulation, including the federal securities laws and
7    the rules of the Nasdaq stock exchange on which Nikola's shares trade publicly.   Section
8    5250(b)(1) of Nasdaq's General Procedures and Prerequisites for Initial and Continued
9    Listing on the Nasdaq Stock Market state that "[e]xcept in unusual circumstances, a
10   Nasdaq-listed Company *shall make* prompt disclosure to the public through any Regulation
11   FD compliant method (or combination of methods) of disclosure of any material
12   information that would reasonably be expected to affect the value of its securities or
13   influence investors' decisions." (emphasis added).   Additionally, IM-5250-1 of Nasdaq's
14   General Procedures and Prerequisites for Initial and Continued Listing on the Nasdaq Stock
15   Market states that "[i]n certain circumstances, it may also be appropriate to publicly deny
16   false or inaccurate rumors, which are likely to have, or have had, an effect on the trading in
17   its securities or would likely have an influence on investment decisions."   These Nasdaq
18   rules reinforced the duty for Individual Defendants to ensure that accurate, truthful, and
19   complete information is disclosed about Nikola and Mr. Milton, which Individual
20   Defendants failed to do.

21        233.    As a direct or proximate result of Individual Defendants' breaches of
22   fiduciary duties, Mr. Milton has sustained, and will continue to sustain, significant damages
23   for which Individual Defendants are liable to Mr. Milton.   Such damages include, among
24   other things, payment of fines, costs associated with defending securities class action
25   lawsuits, government investigations, and subpoenas, and severe damage to the value of Mr.
26   Milton's shares of Nikola stock.

27                              **PRAYER FOR RELIEF**

28   WHEREFORE, Plaintiff prays for relief and judgment as follows:

a.     Declaring that Individual Defendants have breached their fiduciary duties to Nikola;

b.     Awarding Plaintiff the damages he sustained as a result of the securities law violations set forth above from each of the Defendants, jointly and severally, in an amount that still is being calculated, but on information and belief, is over $1 billion, based upon information currently available to Plaintiff;

c.     Awarding Plaintiff the damages he sustained as a result of the breaches of fiduciary duties set forth above from each of the Individual Defendants, jointly and severally, in an amount that still is being calculated, but on information and belief, is over $1 billion, based upon information currently available to Plaintiff;

d.     Awarding to Plaintiff the costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees, costs, and expenses;

e.     Awarding pre- and post-judgment interest; and

f.     Granting such other and further relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues so triable.


SIGNED THIS 6th DAY OF JUNE, 2024

By: B. Lance Entrekin
B. Lance Entrekin, Esq.
**The Entrekin Law Firm**
3101 North Central Avenue, #740
Phoenix, Arizona 85012
 602.954.1123
lance@entrekinlaw.com


*/s/* Bradley J. Bondi
Bradley J. Bondi (*Pro Hac Forthcoming*)
Traci Zeller (*Pro Hac Forthcoming*)
Michael D. Wheatley (*Pro Hac Forthcoming*)
**Paul Hastings LLP**
2050 M Street NW

Washington, DC 20036
Telephone:  202.551.1700
bradbondi@paulhastings.com
tracizeller@paulhastings.com
michaelwheatley@paulhastings.com

Sara Ortiz (*Pro Hac Forthcoming*)
**Paul Hastings LLP**
200 Park Avenue
New York, NY 10166
Telephone:  212.318.6000
saraortiz@paulhastings.com

**CERTIFICATE OF FILING**

I hereby certify that on June 6th, 2024, I electronically transmitted the foregoing

document to the Clerk's Office using the ECF System for filing.

By: <u>B. Lance Entrekin</u>
B. Lance Entrkin, Esq.
**The Entrekin Law Firm**
3101 North Central Avenue, #740
Phoenix, Arizona 85012
lance@entrekinlaw.com

1

**VERIFICATION OF PLAINTIFF**

2

3

Plaintiff Trevor Milton, hereby declares under penalty of perjury that it has

reviewed the foregoing Complaint, and the factual allegations contained therein are true

4

and correct to the best of his knowledge, memory, information, and belief and to those

5

6

matters stated on information and belief, he believes them to be true.

7

8

Executed on June 6th, 2024

9

10

By: _____

11

Trevor Milton

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

83